In re Donald C. LITTLETON, Respondent.

No. 66570.

Supreme Court of Missouri, En Banc.

Nov. 18, 1986.

Rehearing Denied Dec. 16, 1986.

**ORIGINAL DISCIPLINARY PROCEEDING**

ROBERTSON, Judge.

This is a disciplinary proceeding instituted by the Bar Committee of the Twenty-Second Judicial Circuit pursuant to Supreme Court Rule 5. On November 15, 1984, the Bar Committee filed an information against the respondent, Donald C. Littleton, an attorney engaged in the practice of law in the City of St. Louis, Missouri. This Court appointed the Hon. George A. Adolf, Circuit Judge, Twenty-Second Judicial Circuit, Special Master. The Master conducted a hearing, entered findings of fact and conclusions of law, and recommended that respondent be suspended from the practice of law for a period of six months.

### I.

The information filed by the Bar Committee alleges four separate instances of professional misconduct on the part of the respondent. First, it is alleged that Ronald Vedder paid respondent a fee of $150 to procure the release of Gayle Weibel from jail where she was held on a charge of driving while intoxicated. The Bar Committee alleges that respondent failed to carry out his contract of employment for professional services in a prompt manner in violation of Missouri Supreme Court Disciplinary Rules DR 1–102(A)(1), DR 6–101(A)(3), and DR 7–101(A)(1), (2) and (3).

Second, the Bar Committee charges that respondent obtained $500 each from a friend of Weibel and a member of Weibel's family under the pretense that this additional money was "necessary as bail bond money" to secure Ms. Weibel's release from jail. Respondent thereafter refused to return the money when it was not needed for bail purposes. Respondent's conduct is alleged to violate Missouri Supreme Court Disciplinary Rules DR 1–102(A)(1), DR 1–102(A)(2), DR 1–102(A)(3), DR 1–102(A)(4), DR 2–106(A), DR 9–102(B)(3), and DR 9–102(B)(4).

Jeffrey J. Lowe, St. Louis, informant.

James A. Stemmler, St. Louis, for respondent.

Third, the Bar Committee alleges that respondent made late night visits to Ms. Weibel while she was incarcerated and made sexual advances toward her during those visits. It is further alleged that respondent sexually assaulted Ms. Weibel following her release from jail. The information charges that these acts violate Missouri Supreme Court Disciplinary Rules DR 1–102(A)(1), DR 1–102(A)(3), DR 1–102(A)(4), and DR 1–102(A)(6).

Fourth, the information avers that respondent accepted a number of files from a Wanda Leasure, promising to review them and advise her on the matters contained therein; that respondent failed to review the files and failed to return the files to Ms. Leasure when she requested them; and that respondent failed to forward the files to Ms. Leasure's new attorney when so directed. The Bar Committee charges that this conduct violates Missouri Supreme Court Disciplinary Rules DR 1–102(A)(1), DR 6–101(A)(3), and DR 7–101(A)(1), (2), and (3).

## II.

The Special Master found that respondent was hired by his friend Ronald Vedder to represent Vedder's friend Gayle Weibel who had been arrested on January 17, 1983, by St. Louis County authorities for driving while intoxicated. Respondent first saw Weibel in the early morning hours of January 18, 1983, at the St. Louis County jail in Gumbo, Missouri. The meeting between Weibel and respondent took place in the library at the prison facility. At that meeting, respondent continued to attempt to draw Weibel near to him; she was continually forced to move around the library table to avoid respondent's advances. Respondent made similar advances during at least one other late night meeting with his client at the jail.

At the time of Weibel's arrest on January 17, Weibel was under another driving while intoxicated charge pending in St. Louis County, as well as municipal charges in both Crestwood and Kirkwood for stealing under One Hundred and Fifty Dollars ($150.00). Bench warrants were outstanding in both cities on account of Weibel's failure to appear in court when scheduled on the charges pending.

Vedder contacted Jack Rea, another friend of Weibel's, and informed him that Weibel's bail would require $1,000. Rea then called respondent and made arrangements to meet him. At the meeting, Rea gave respondent $500 cash. Respondent provided Rea with a receipt written on his business card. "Bail bond received $500 from Jack Rea—on behalf of Gayle Weibel. Don Littleton."

Vedder also contacted Weibel's stepfather, Charles Smith, about the need for money to obtain Weibel's release. Smith gave $500 to Vedder, who in turn gave the money to respondent, telling respondent that it was bond money.

Respondent worked diligently to obtain Weibel's release from jail. He was successful in consolidating all of the St. Louis County charges in a single court and reducing the bond to $50, which respondent posted on January 24, 1983.

Upon her release from the St. Louis County jail, Weibel was taken to the Crestwood Police Department by the Crestwood Police on her outstanding bench warrant. (Kirkwood authorities apparently no longer had any bond or hold orders on her.) Through the efforts of respondent, Weibel was released by the Crestwood Police late in the evening of January 24, 1983, on her own recognizance. Weibel accepted respondent's offer to take her to Vedder's home, where she intended to spend the night.

While in respondent's car, respondent's hand brushed across Weibel's breasts. Subsequently, respondent parked his automobile, and again made advances toward Weibel. Weibel successfully stopped these advances by promising to get her things at Vedder's and accompany respondent to her apartment "where we can relax."

Respondent returned Weibel to Vedder's home where she informed Vedder of the events of the ride home. Vedder demand-

ed that respondent return the $1,000 that he had been given for bond purposes. Respondent left without responding.

The following morning, January 25, 1983, Weibel filed a complaint about respondent's conduct with the St. Louis County Police. A charge of sexual abuse, third degree, was issued against respondent and presented to the grand jury. The grand jury issued a no true bill.

Over the course of a substantial period of time, Vedder attempted to obtain a return of the $1,000 which had been given respondent for bond purposes. Respondent maintained that the money had not been given him for bond purposes but for his legal fee for representing Weibel. Approximately four to five months after disciplinary proceedings were originated, respondent returned the $500 to Rea, the $500 which Weibel's stepfather had provided, and the $150 fee to Vedder.

### III.

We are not bound by the Master's findings in a disciplinary action. *In re Weiner*, 547 S.W.2d 459, 460 (Mo. banc 1977). Instead, we review the evidence ourselves and decide all issues of fact necessary to a decision. *In re Frick*, 694 S.W.2d 473, 474 (Mo.Banc 1985); *In re Pine*, 576 S.W.2d 538, 539 (Mo. banc 1979). Guilt must be proven by a preponderance of the evidence. *In re Frick, supra* at 478; *In re Connaghan*, 613 S.W.2d 626, 628 (Mo. banc 1981).

### A.

In his first point before this Court,[1] respondent urges that complainant Bar Com-

mittee failed to meet its burden of proof regarding the alleged sexual advancement. Respondent argues that Weibel's testimony was the only testimony supporting her charges and that Weibel is a person whose reputation for truth and honesty in the community is such that she cannot be believed.

The basis for respondent's argument is a tape recording made of a conversation between respondent's attorney and Ron Vedder without Vedder's knowledge.[2] We have reviewed the transcript of the tape recording provided by respondent with great care. In that conversation, Vedder expresses concerns about Weibel's commitment to the truth generally. However, his testimony at the hearing tends to support Weibel's account of the events of the late evening of January 24, 1983.

Our review of the evidence, including that contained in the tape recording, leads us to conclude as did the Master, that Weibel had been sexually confronted by respondent. The testimony of Ron Vedder regarding Weibel's arrival at his home, and Weibel's acts of filing a complaint both with the police the next morning and with the Circuit Bar Committee, are consistent with her testimony and indicate a belief in her cause. We, therefore, conclude, as did the Master, that the complainant Bar Committee met its burden of proof with regard to its allegations of improper sexual advancements toward informant Weibel.

DR 1–102(A)(3) provides that a lawyer shall not "engage in illegal conduct involving moral turpitude." DR 1–102(A)(3) proscribes "illegal conduct"; it does not require conviction of a crime.

1. In the information, respondent is alleged to have neglected the Weibel legal matter. Our review of the record indicates that respondent pursued his representation of Weibel diligently and, as the Master found, efficiently. Complainant Bar Committee failed to prove its charges of respondent's neglect of his duties to Weibel and in its brief before this Court, no longer pursues the point. Complainant's allegations of neglect of Weibel's legal matters are, therefore, dismissed.

2. The propriety of the making of such tape recording is not before the Court in this case. We have reviewed the record regarding the tape recording and find that it meets the test set out in *State v. Spica*, 389 S.W.2d 35, 44 (Mo.1965). Without commenting on the propriety of the manner in which the tape recording was obtained, we note that evidence obtained in an illegal or unethical manner is not subject to an exclusionary rule except in criminal cases. *See Diener v. Mid-American Coaches, Inc.*, 378 S.W.2d 509, 511 (Mo.1964).

Moral turpitude has been defined as "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen or to society in general, contrary to the accepted and customary rule of right and duty between man and man; everything done contrary to justice, honesty, modesty and good morals." *In re Wallace*, 323 Mo. 203, 19 S.W.2d 625 (banc 1929).

The Supreme Court of Indiana determined that an attorney who grabbed his female client, kissing her and raising her blouse was guilty of illegal conduct involving moral turpitude. *In the Matter of Adams*, 428 N.E.2d 786 (Ind.1981). We, too, conclude that conduct like that exhibited by respondent in this case is "contrary to justice, honesty, modesty and good morals." *In re Wallace, supra.*

Respondent and Weibel entered into a professional relationship. Weibel had a right to expect that respondent would conduct himself in that relationship in a manner consistent with the honorable tradition of the legal professional—a tradition founded on service, integrity, vigorous commitment to the client's best interests, and an allegiance to the rule of law. Instead of remaining true to that tradition, however, respondent chose to exploit it, seeking to turn the professional relationship into a personal one. "Conduct of this ilk is particularly repugnant while the client is dependent upon the attorney for guidance and assistance." *In the matter of Adams, supra* at 787.

We find that respondent's conduct violated DR 1–102(A)(3).

**B.**

In his second point in this Court, respondent argues that the Bar Committee failed to sustain its burden of showing that respondent acted improperly in failing to refund the $1,000 respondent had been given to secure Weibel's release from jail. Respondent contends that it was unreasonable for Vedder to demand an immediate return of the bond money when respondent arrived at Vedder's home with Weibel follow-ing her release from jail. The issue is not whether the demand for the return of the money was reasonable. Nor is the issue whether respondent earned the money; the facts reveal that respondent invested substantial time in this matter. The issue upon which we must focus is whether respondent engaged "in conduct involving dishonesty, fraud, deceit, or misrepresentation." DR 1–102(A)(4).

In *In re Wendt*, 544 S.W.2d 3 (Mo. banc 1976), an attorney accepted funds to meet the bond requirements of a client charged with a crime. When the attorney's efforts to obtain the client's release on bond were unsuccessful, the attorney kept the money in partial payment for his professional services rendered. This Court determined that the attorney was guilty of professional misconduct in failing to return the bond money.

Here, respondent accepted funds for Weibel's bond. The receipt provided by respondent so identified the funds. When the money paid for Weibel's bond was not needed for that purpose, respondent claimed the money as a fee for his legal services. We conclude, as did the Special Master, and as did this Court in *In re Wendt, supra,* that respondent is guilty of misrepresenting the purpose for which he accepted the $1,000, in violation of DR 1–102(A)(4).

**C.**

As to the Leasure complaint, respondent is charged with neglecting a legal matter entrusted to him. For the reasons which follow, it will serve little purpose to discuss the details of the Bar Committee's allegations.

On September 20, 1984, the Bar Committee conducted a formal hearing on the Leasure complaint. After hearing the evidence, the Committee voted 4–0 to issue a letter of admonition. The next day, at the request of the special representative of the Bar Committee, and without the knowledge of the respondent, the Bar Committee reconsidered the case and voted 3–1 to issue

an information. The record does not reveal what the special representative did or said or whether he offered new evidence to the Bar Committee. It is not disputed, however, that as a result of the special representative's meeting with the Bar Committee, the original vote was reconsidered and a new vote cast to issue an information. It is also clear that respondent did not have an opportunity to respond to the special representative's arguments to the Bar Committee.

Respondent claims that his constitutional right to due process was violated by the special representative's ex parte communication with the Bar Committee. Respondent further argues that the Bar Committee's proceedings on all complaints against him were tainted by this alleged due process violation.

We need not reach the due process issues respondent raises. Before this Court, the Bar Committee has abandoned its complaint against respondent in the Leasure matter. That part of the information alleging misconduct by respondent with regard to Wanda Leasure is dismissed. Respondent's claim that the Bar Committee's proceeding regarding other complaints were also tainted is without merit. The Bar Committee voted to issue on information in the Weibel case on the day before the Bar Committee's second vote on the Leasure matter. We are not persuaded that *ex parte* communications, which took place a day later, could have affected the vote on the Weibel complaint.

### D.

Respondent also contends that this Court's refusal to grant a second extension of time in which to file exceptions to the Master's report, constitutes a denial of both due process and equal protection. ■ This Court conducts the judicial component of the attorney disciplinary proceedings. *In re Mills*, 539 S.W.2d 447, 450 (Mo.banc 1976). This Court is charged with determining all fact issues necessary to a decision. *In re Frick, supra* at 474. Respondent is not precluded from arguing

his exceptions to the Master's report in proceedings before this Court. Rule 68.-03(g). Respondent has been given a full opportunity to brief and argue both the facts and the law he believes pertinent to this Court's deliberations. No due process or equal protection issue is presented. The point is denied.

### IV.

Rule 5.18 provides:

If the findings be that the charges [against Respondent] are true, the Court shall render a judgment finding Respondent guilty and shall reprimand the Respondent or suspend him from practice for an indefinite period or a time fixed in the discretion of the Court or disbar him, as shall to the Court seem proper...."

■ The purpose of discipline is not to punish the attorney, but to protect the public and maintain the integrity of the legal profession. *In re Frick, supra* at 479. Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction which serves to deter other members of the Bar from engaging in similar conduct.

■ This Court has held that disbarment should be reserved for those cases in which it is clear that respondent is one who should not be at Bar. *In re Sullivan*, 494 S.W.2d 329, 334 (Mo. banc 1973). Reprimand, on the other hand, is appropriate only where the attorney's breach of discipline is an isolated act, *id.*, and does not involve dishonest, fraudulent, or deceitful conduct on the part of the attorney.

■ Between disbarment and reprimand lies the sanction of suspension. Suspension is an appropriate intermediate sanction where reprimand is insufficient to protect the public and maintain the integrity of the profession, and where this Court does not believe that the acts of a respondent are such that he should not be at Bar. Suspension serves the dual purposes of discipline; it protects the public and maintains the

integrity of the profession by deterring other members of the bar from engaging in similar conduct. Suspension also recognizes that while the focus of discipline is to achieve the purposes previously described, those purposes are inevitably achieved through punishment. *In re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1225, 20 L.Ed.2d 117 (1968).

■ Suspension is never a proper substitute for disbarment. Where an attorney has committed an act of fraud, dealt in a purposefully dishonest manner with a client, or sought to enrich himself dishonestly at the expense of others, disbarment is the appropriate sanction.

■ Where, however, suspension is the appropriate sanction, the Court is faced with the difficult task of determining *present* fitness to practice following a suspension for *past* acts of misconduct. It is not enough to assume present fitness to practice; where misconduct is serious enough to warrant suspension, proof of present fitness to practice should be required before reinstatement is ordered.

Our Rule 5.09 provides:

> When a person ... who has been ... suspended, makes application for reinstatement, a cash deposit for costs of investigating and reporting on such application for reinstatement, in the amount fixed by The Advisory Committee, shall be paid to the Clerk of this Court within the time allowed by The Advisory Committee.

In following Rule 5.09, this Court faces a practical problem. In almost every case in which reinstatement from suspension has been sought, the Advisory Committee's recommendation and the Court's final determination of fitness to practice have taken far too long, in some cases over a year. This results in an extension of the suspension period substantially beyond that originally imposed. It is entirely unsatisfactory, for example, to suspend an attorney with leave to apply for reinstatement after six months, only to find that he or she is not reinstated for eighteen months.

We should not be dissuaded from employing suspension in appropriate cases simply because our disciplinary machinery operates too slowly. Instead, we must speed up the machinery. We may accomplish this in two ways. First, we can require the Advisory Committee to file its Rule 5.09 report with this Court within sixty days of receiving a perfected application for reinstatement. Second, we can expedite our own consideration of the Advisory Committee's report. Each of these steps, which we now adopt, will allow us to continue to employ suspension in appropriate cases.

## V.

The Master has recommended that the respondent be suspended from the practice of law for a period of six months. Respondent argues that the Master's recommended sanction is excessive and that a public reprimand is the appropriate sanction under these circumstances. Respondent relies on cases in which reprimand has been deemed a sufficient punishment for acts similar to those committed by the respondent. *In the matter of Adams, supra; In re Stevens*, 28 Cal.3d 873, 172 Cal.Rptr. 676, 625 P.2d 219 (1981); *Committee on Professional Ethics v. Durham*, 279 N.W.2d 280 (Ia.1979). Each of the cases upon which respondent relies involves an isolated, single incident of misconduct. In this case, respondent has been found to have committed more than one breach of professional conduct. Given the cumulative nature of respondent's transgressions, we believe that reprimand is not an appropriate sanction in this case.

## VI.

■ It is, therefore, ordered that respondent be indefinitely suspended from the practice of law with leave to apply for reinstatement at the end of six months. Such suspension shall commence on the date of rendition of this decision.

HIGGINS, C.J., and BILLINGS, DONNELLY and RENDLEN, JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

WELLIVER, J., dissents in separate opinion filed.

BLACKMAR, Judge, concurring.

I normally do not approve of suspensions, believing that the lawyer who is not qualified to practice should be disbarred and that the practice of one who is qualified should not be interrupted, to the inconvenience of his clients.

I concur in the present disposition because I am in doubt as to the respondent's present ability to practice law. Nor do I believe that the charges require disbarment. The disposition in the principal opinion gives the opportunity for the necessary inquiries before the respondent may resume practice.

WELLIVER, Judge, dissenting.

I respectfully dissent.

I fail to see the wisdom of the new and fresh approach to lawyer discipline proposed by the author of the principal opinion.

It always has been my belief that there is no such thing as being ethically half qualified to practice law, you are either ethically qualified or you are not ethically qualified. In my view, one who fails to carry out his contract of employment for professional service promptly; who solicits $500 each from a friend of the client and from a family member of the client for bond money and refuses to return the money when bond is set at $50; who makes sexual advances to the client; and, who accepts a number of files from another client and fails to either review them or return them, is not a person ethically qualified to represent the public in legal matters.

The Court's primary obligation is to protect the public.[1] The purpose of discipline is not to punish lawyers.[2] All that can be said for "suspension" is that it gives the appearance of imposition of punishment. All that the suspension for months does is put the offender's law practice on hold for the designated number of months. If there is no evidence now before us at the present time to indicate that the offender has or will change his erring ways, what real possibility is there that he will have so changed in the brief period of six months. Viewed as punishment, which is all that the suspension can possibly amount to—the suspension is nothing more than a gentle slap of the wrist. Wrist slapping does not protect the public, it deceives and misleads the public.

A few years following the formation of the Integrated Missouri Bar, this Court started giving "suspensions for an indefinite period of time" or "indefinite suspensions" with leave to apply for reinstatement at a fixed time (generally one to five years)[3] as something that should be more acceptable to and more palpable to the disciplined lawyers. These were "disguised disbarments." For most of the last decade, the Court has faced up to its obligation and duty to the public and has abandoned the use of the suspension "fiction" or "disguised disbarment."

Today, we re-invent the wheel by returning to the "indefinite suspension" with leave to reapply at a fixed time. The only difference is that we make our wrist slap-

1. *In re Lang,* 641 S.W.2d 77 (Mo. banc 1982); *In re Randolph,* 347 S.W.2d 91 (Mo. banc 1961); *In re Canzoneri,* 334 S.W.2d 30 (Mo. banc 1960).

2. *In re Sabath,* 662 S.W.2d 511 (Mo. banc 1984); *In re Randolph,* 347 S.W.2d 91 (Mo. banc 1961).

3. 1 year—*Matter of Lowther,* 611 S.W.2d 1 (Mo. banc 1981).

18 months—*In re Kueter,* 501 S.W.2d 486 (Mo. banc 1973).

2 years—*In re Sabath,* 662 S.W.2d 511 (Mo. banc 1984); *In re Lang,* 641 S.W.2d 77 (Mo. banc 1982); *In re Gamblin,* 458 S.W.2d 321 (Mo. banc 1970).

3 years—*In re Houtchens,* 555 S.W.2d 24 (Mo. banc 1977); *In re Mattes,* 409 S.W.2d 54 (Mo. banc 1966); *In re McMullin,* 370 S.W.2d 151 (Mo. banc 1963); *In re McLendon,* 337 S.W.2d 56 (Mo. banc 1960); *In re Canzoneri,* 334 S.W.2d 30 (Mo. banc 1960).

5 years—*In re Lurkins,* 374 S.W.2d 67 (Mo. banc 1964).

ping even more gentle and our process more deceptive to the public by restricting and limiting the time in which the Advisory Committee may investigate and determine the offender's qualifications to practice law.

Missouri Bar, during the year that I served as President (1967–68), had approximately 7,000 lawyers. Today Missouri Bar has more than 19,000 licensed lawyers, approximately one lawyer for each 251 people in the state. It is inconceivable that we will deprive the public of adequate legal representation by disbarring a few of those who prove themselves unqualified to represent the public. There is no shortage of lawyers. And, perhaps as a result of following a policy of firm discipline, eventually, we may fulfill our secondary obligation—to protect the Bar by assuring the public that they can have confidence in the remainder of the 19,000 lawyers who are out there trying to honestly and effectively represent their clients.

The public has a right to have its legal business handled promptly and competently. Members of the public who entrust money to lawyers for a specified purpose should not have to sue for the rightful return of the unused portion of the entrusted funds. Sexual harassment and sexual assault of women are not among the qualifications for a license to practice law.

I would disbar respondent.

