**In re William R. MURPHY, Respondent.**

**No. 67770.**

Supreme Court of Missouri, En Banc.

June 16, 1987.

Rehearing Denied July 14, 1987.

Richard J. Mehan, Jr., St. Louis, for information.

Earle B. Leadlove, St. Louis, for respondent.

RENDLEN, Judge.

The Bar Committee of the Twenty-second Judicial Circuit instituted disciplinary proceeding against respondent and following formal hearing found probable cause to believe respondent was guilty of professional misconduct. An Information was filed in this Court charging violation of Rule 4[1] DR 1–102(A)(3), (4) and (6),[2] DR 6–101(A)(3),[3] DR 7–101(A)(1) and (2),[4] and DR 9–102(B)(3)[5] in that:

After accepting a payment of $1,000.00 as his fee, William R. Murphy failed, over a period of several years beginning in 1978, to file a lawsuit he had agreed to file against the executor of Dorothy Ruprecht's husband's estate (and later against the estate of that executor when he died). Although the lawsuit had never been filed, William R. Murphy told Mrs. Ruprecht in 1981 that it had been filed. In handling the estate of Mrs. Ruprecht's husband (as attorney for the subsequent executor), he neglected various administrative matters, causing undue delay in the closing of the estate. Furthermore, he failed to deposit certain assets of the estate in an interest bearing account, despite informing Mrs. Ruprecht and the Probate Court that the assets had been deposited in such an account. Finally, he did not diligently pursue a landlord/tenant matter Mrs. Ruprecht asked him to handle for her.

Respondent answered denying the charges and additionally renewed a "Motion to Dismiss or in the Alternative to Suppress Transcript of Recorded Tape Conversation." The Honorable John L. Anderson, Circuit Judge, Twenty-third Judicial Circuit, serving as Master, overruled respondent's motion and after plenary hearing, in his findings of fact and conclusions of law, determined that respondent had violated the cited disciplinary rules and recommended disbarment.

### I. *Evidence*

Pertinent evidence adduced in this proceeding includes the following:

*Stock matter and McKean lawsuit:* In 1969 Dorothy Ruprecht was divorced from her husband Edward Ruprecht, who died in 1977. Edward Ruprecht owned shares of stock in Ruprecht Building Materials Com-

---

1. The Information charges respondent with violation of former Rule 4, Code of Professional Responsibility, which has been repealed and supplanted by new Rule 4, Rules of Professional Conduct, effective January 1, 1986. Former Rule 4 governed respondent's conduct at the time of the alleged violations.

2. A lawyer shall not engage in "illegal conduct involving moral turpitude," DR 1–102(A)(3), "conduct involving dishonesty, fraud, deceit, or misrepresentation," DR 1–102(A)(4), nor "any other conduct that adversely reflects on his fitness to practice law." DR 1–102(A)(6).

3. A lawyer shall not neglect a legal matter entrusted to him. DR 6–101(A)(3).

4. DR 7–101 provided in pertinent part:
   (A) A lawyer shall not intentionally:
   (1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.
   (2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

    .     .     .     .     .

   (B) In his representation of a client, a lawyer may:
   (1) Where permissible, exercise his professional judgment to waive or fail to assert a right or position of his client.
   (2) Refuse to aid or participate in conduct that he believes to be unlawful, even though there is some support for an argument that the conduct is legal.

5. DR 9–102(B)(3), prior to an amendment effective January 1, 1985, provided in pertinent part that a lawyer shall "[m]aintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

pany and had pledged those shares to secure a loan from that company. On March 2, 1978, upon default the stock was sold at a foreclosure sale. On March 10, 1978, Dorothy Ruprecht retained respondent [6] to provide legal assistance regarding her children's interest in Edward Ruprecht's estate; specifically she sought to reobtain the stock for her children. She paid respondent $200, noting on the check "Retainer Ruprecht Estate," and soon thereafter gave respondent three additional checks: $200 on March 23, 1978; $350 on April 21, 1978; and $250 on July 20, 1978.

On August 28, 1978, Dorothy Ruprecht gave respondent another check for $73, which she testified was for the filing of a lawsuit against Charles McKean, who at that time was executor of Edward Ruprecht's estate. The suit was never filed and McKean died in July 1979, but the $73 was not returned to Dorothy Ruprecht. Respondent testified he did not remember the purpose of the $73 payment but recalled that Dorothy Ruprecht and he discussed the possibility of filing a lawsuit against McKean as executor of the estate for failing to attempt to avoid default or failing to exercise an option to repurchase the stock. Further, although he prepared the suit for filing, he did not proceed because he determined there were insufficient assets in Edward Ruprecht's estate for McKean to have repurchased the stock and he believed such suit would be counterproductive to ongoing negotiations to repurchase the stock.

On September 1 and September 15, 1978, Dorothy Ruprecht gave respondent two $500 checks which sums she testified were for respondent's continued services in the McKean matter. She testified that at that time she thought the suit against McKean had been prepared and that during this period she was not kept apprised of matters.

On January 24, 1980, subsequent to McKean's death, Dorothy Ruprecht paid respondent $125, noting on the check "court costs on McKean suit," and she testified it was for the filing of a lawsuit against McKean's estate which would have to be filed soon due to a limitations period. In fact this suit, too, was never filed, but the $125 was not returned to Dorothy Ruprecht. Again respondent testified that, although they did discuss filing a lawsuit against McKean's estate, it was not filed, apparently for the same reasons he did not file the suit against McKean. He further testified the $125 remains in a business trust account and if Dorothy Ruprecht so requested he would return it to her because "I told her that I would file the suit and the suit wasn't filed."

On October 28, 1981, as evidenced by a tape recording secretly made by Dorothy Ruprecht, respondent told her that a suit against McKean had been filed "[a] long time ago" but that it had not been set for trial "until within the past year." Respondent testified that when he told her the suit had been filed he knew it had not been and he testified that under the applicable limitations period a suit against McKean's estate would have had to have been filed by about February 13, 1980. He also testified, however, that when he told Dorothy Ruprecht he had filed the suit he had in fact prepared the suit for filing and while McKean

---

6. Initially Dorothy Ruprecht sought the assistance of attorney Arthur McLeod. However, although McLeod attended some of the meetings between respondent and Dorothy Ruprecht, she testified McLeod "turn[ed her] over" to respondent and eventually she dealt solely with respondent. Respondent testified Dorothy Ruprecht was both his and McLeod's client, her case was a "joint case," i.e., he and McLeod split the work and the fee, and McLeod may have requested some of the money paid by Dorothy Ruprecht. Respondent could not remember whether he ever informed Dorothy Ruprecht he and McLeod were splitting the fees. Prior to the hearing before the Master, McLeod died and, other than the fact that McLeod attended some of the meetings, there is no evidence besides respondent's testimony that McLeod shared in the representation of Dorothy Ruprecht. In fact, all checks written by Ruprecht in these matters, at least all those in evidence, were made out solely to respondent. Although we find from the evidence Dorothy Ruprecht was respondent's client and not McLeod's, a contrary finding would not alter our discipline of respondent since he concedes Ruprecht was his client as well as McLeod's and since the alleged violations concern respondent's representation and conduct.

was living had filed a motion in the Probate Division to remove McKean as executor of the estate for his failure to notify Edward Ruprecht's heirs of the default, though respondent never "called up" the motion since it would not "accomplish what we wanted to do." The "Motion to Compel" was admitted in evidence and Dorothy Ruprecht testified she had seen the motion.

Both respondent and Dorothy Ruprecht testified that the primary objective was to reobtain the stock and respondent did pursue that objective, though not "correctly" in Dorothy Ruprecht's opinion. Respondent testified a lawsuit against McKean or his estate could not have achieved that result and he did pursue the primary objective by reviewing documents relating to the sale and through ongoing negotiations for a repurchase of the stock. He testified repurchasing of the stock was hampered by personal and health problems of Edward Ruprecht's sister, the principal shareholder in Ruprecht Building Materials Company. As evidence of his efforts respondent submitted documents reviewed and correspondence pertaining to attempts to repurchase the stock. Although respondent testified the money paid him by Dorothy Ruprecht was for his services rendered in the stock matter, he also testified the money compensated him not only for his assistance in the stock matter but also for an ongoing legal relationship he had with Dorothy Ruprecht and her son, including his advising them as to their use of buildings on property owned by Ruprecht Building Materials Company, and "[o]nce or twice" he sent the Ruprechts itemized statements for his charges. Dorothy Ruprecht testified the moneys were for his assistance in the stock matter, including filing the discussed lawsuit, and respondent never advised her the proposed lawsuits against McKean or his estate would be meritless.

On November 18, 1981, Dorothy Ruprecht advised respondent by letter that "we no longer wish you to represent us in any matter for which we had previously sought legal counsel."

*Handling of the estate:* Meanwhile, in January 1980, upon Edward and Dorothy Ruprecht's son Edward having attained the age of twenty-one and having succeeded McKean as executor of his father's estate, respondent became the attorney for the new executor.

In this capacity it was respondent's responsibility to file annual settlements on behalf of the executor. In 1980, 1981, 1982 and 1984 respondent was delinquent in filing those papers, for no particular reason, and on each occasion the court issued show cause orders threatening the removal of the son as executor. Also on each occasion the court charged the estate $25, though respondent testified he thought he paid the charges and the charges therefore did not result in additional costs to the estate. Dorothy Ruprecht's son Edward also testified respondent paid some of the penalties against the estate.

The report in lieu of annual settlement which respondent filed in 1982 includes a handwritten notation indicating the checking account holding the estate's assets was an interest-bearing account. Although respondent denied he had made the notation, he did admit initialing that notation. He testified he initialed the notation at the direction of a court employee "to get the settlement approved and out of the way for the year." In fact when that report was filed the account was not interest-bearing and the money was not deposited into an interest-bearing account until March 1983, although Dorothy Ruprecht had requested that it be done prior to that time. She testified that she and her son saw the notation on the report filed with the court and she relied upon it. Respondent testified he did not intend to deceive anyone, noting the 1982 account reflected no amount in interest and the report filed in 1983 did not show the checking account to be interest-bearing. Dorothy Ruprecht's son Edward testified that at no time did he direct respondent to deposit the money into an interest-bearing account.

Respondent testified the estate was not closed until 1985 because of the attempts to repurchase the stock and the Internal Revenue Service's delay in reissuing a check, for sums owed Edward Ruprecht's

estate by the I.R.S., which initially was issued in McKean's name. Respondent received the check, dated January 8, 1980, from the former attorneys for the estate sometime in 1980. Because McKean had died it was necessary to have the I.R.S. reissue the check in the succeeding executor's name. Respondent testified the commissioner of the probate court advised him that she preferred the estate not be closed and no distribution be made until a reissued check was received. He further testified he returned the check and the necessary paper work for reissuance of the check in early 1981 and forwarded additional requested materials to the I.R.S. in February 1983. On August 1, 1983, the I.R.S. issued a notice, which respondent testified he never received, stating the check had been mailed and returned to it as undeliverable. Eventually a reissued check was delivered to the son in 1984.

Although an order approving distribution was approved January 25, 1985, the estate was not closed until October 1985. The estate could not be closed until outstanding court costs charged to the estate were paid, though respondent testified there was "another delay" requiring his and the executor's appearance in court.

Although Dorothy Ruprecht testified that by her letter discharging respondent she intended to discharge him as the executor's attorney as well as discharging him from all other matters, her son Edward, the executor, testified he never discharged respondent.

*Landlord/tenant matter:* On June 20, 1979, Dorothy Ruprecht paid respondent $52, noting on the check "court costs & fees Ivy House," for respondent to remove tenants who were living in a house she owned, located on Ivy street in St. Louis County, and who were not paying the $190 monthly rent.[7] Although the check was for court costs and fees, respondent cashed the check at the Missouri Athletic Club, to which he belonged. Nevertheless, respondent testified, he did deposit the money in

the proper accounts. On June 28, 1979, Dorothy Ruprecht paid respondent $150, noting on the check "Bond for Ivy," which money was to be used if a bond was purchased relating to the sheriff's removal of the tenants. Respondent did not file the unlawful detainer action until September 27, 1979, after Dorothy Ruprecht confronted him with his failure to pursue the matter, though she testified respondent had previously told her the action had been filed and a court date set. Even though a bond was never purchased, respondent did not return the $150 to Dorothy Ruprecht until after their meeting of October 28, 1981, at which she inquired of the money. Respondent testified he did expend $22.50 for court costs in the lawsuit and $30 for a special process server. He also testified he could give no particular reason for the delay in returning the $150 and he had no excuse for the delay in filing the action. Evidently though respondent was never successful in serving the tenants, they eventually vacated the premises in October 1979. Dorothy Ruprecht and her son changed the locks on the house. Because the tenants moved, the suit never was concluded. While the wayward tenants continued to not pay the rent through October, Dorothy Ruprecht subsequently was able to rent the house to rent-paying tenants. She further testified that despite respondent's assurances at their October 1981 meeting, he never gave her an itemization of the landlord/tenant matter.

*Annual enrollment fees:* As evidenced by an affidavit of an administrative secretary to the Clerk of this Court, respondent, at the time of the affidavit (October 17, 1986), was suspended under Rule 6.01 from practicing law in Missouri for nonpayment of Missouri Bar annual enrollment fees and resulting penalties for the years 1963, 1976, 1977, 1978, 1980, 1981, 1982, 1983, 1985 and 1986.

## II. *Objections to Evidence*

Respondent asserts the Master erred in overruling his "Motion to Dismiss or in the

---

**7.** As with the stock matter, Dorothy Ruprecht's initial contact concerning the landlord/tenant matter evidently was with Arthur McLeod.

Alternative to Suppress Transcript of Recorded Tape Conversation" and in admitting the affidavit concerning enrollment fees.

At the formal hearing before the Bar Committee on February 22, 1985, following respondent's examination of Dorothy Ruprecht, Committee members questioned her and one member referred to a transcript of the secretly recorded tape from her October 28, 1981, meeting with respondent, which transcript the Committee had seen. Respondent objected to use of the transcript because it had not been provided to him. The hearing was continued until March 22, 1985, at which time respondent could recall Dorothy Ruprecht and call additional witnesses after he had reviewed the transcript. During the intervening month, the special representative of the Committee and respondent met and listened to the tape and respondent was provided with a copy of the transcript of the tape. Additionally, respondent filed his motion to dismiss or, in the alternative, to suppress the transcript of the recorded conversation, which motion the Committee overruled on March 22. At the hearings of March 22 and April 26, 1985, respondent further examined Dorothy Ruprecht and examined additional witnesses.

Subsequent to filing of the Information, respondent answered and renewed his motion to dismiss. At the hearing before the Master, the Master overruled the motion and admitted the transcript. Now before this Court respondent continues his claim that his motion should have been sustained due to his not having been provided a copy of the transcript before formal hearing.

■ The transcript of the recorded conversation, evidently reviewed by the Bar Committee prior to formal hearing but not prior to issuance of notice of formal hearing, was neither provided to respondent with the notice nor at any time prior to formal hearing. Liberally construing Rule 5.13(d),[8] we believe the Committee or its special representative must disclose to a respondent prior to a formal hearing any

evidence obtained and to be considered by the Committee. Nondisclosure risks unfairly hindering a respondent from properly defending himself against alleged misconduct. In this matter the transcript should have been provided to respondent prior to formal hearing.

■ Nevertheless, the error was cured by continuing the hearing and allowing respondent to further examine Dorothy Ruprecht and additional witnesses after having reviewed the transcript. We find no prejudice to respondent under these circumstances. Even in a criminal case, which this proceeding is not, failure to comply with a discovery rule does not result necessarily in dismissal or exclusion of evidence. Rather, a court may order disclosure, grant a continuance, exclude a part of such evidence or enter such other orders as it deems just under the circumstances. Rule 25.16. The question in deciding the appropriate remedy for the state's nondisclosure is whether the state's failure to provide discovery resulted in fundamental unfairness or prejudice to the substantial rights of the defendant. *State v. Sykes,* 628 S.W.2d 653, 656 (Mo. 1982). Respondent in this disciplinary proceeding certainly can claim no greater rights than the criminal defendant. In light of the relief granted respondent, *i.e.,* continuance and right to recall witnesses, the nondisclosure of the transcript did not result in fundamental unfairness or prejudice to the substantial rights of the respondent. Neither dismissal, disqualification of the Committee members nor exclusion of the evidence was necessary and respondent's motion is properly overruled.

■ Respondent also submits it was error to admit and consider the affidavit regarding his failure to pay Missouri Bar enrollment fees and his resulting automatic suspension. We disagree. Such evidence was not offered or considered for the purpose of and is not relevant to determining respondent's guilt or innocence of the particular charges in this proceeding, but rath-

---

8. "The notice shall be accompanied by a copy of any statements or evidence obtained in the investigation under Rule 5.12, except when service is obtained by publication." Rule 5.13(d).

er was offered and considered for the purpose of and is relevant to determining the appropriate sanction if guilt is determined. We also note that at the hearing before the Master respondent objected to the affidavit's admission because affiant should testify and be available for cross-examination. We need not consider the merits of this evidentiary claim since the substance of the affidavit concerns records of this Court and we may of course take judicial notice of our own records for proper purposes. *McIlvain v. Kavorinos*, 361 Mo. 749, 236 S.W.2d 322, 326 (banc 1951).

### III. *Findings*

■ This Court is not bound by the Master's findings in a disciplinary action, *In re Littleton*, 719 S.W.2d 772, 775 (Mo. banc 1986), but instead they are essentially advisory, *In re Staab*, 719 S.W.2d 780, 781 (Mo. banc 1986), and "we must review for ourselves the evidence, the credibility, weight and value of the witnesses, and determine all fact issues necessary to a decision." *In re Williams*, 711 S.W.2d 518, 519 (Mo. banc 1986). Respondent's guilt must be proven by a preponderance of the evidence. *Littleton*, 719 S.W.2d at 775.

Our review of the evidence leads us to find the pertinent facts to be as follows:

Dorothy Ruprecht gave respondent $2,000 in 1978 for legal services including his assistance in reobtaining Edward Ruprecht's stock for her children and respondent led her to believe he would file a claim against McKean, and later against McKean's estate, for McKean's failure as executor to attempt to avoid default or to redeem the stock. Specifically, she paid respondent $73 on August 28, 1978, for the filing of a lawsuit against McKean and $125 on January 24, 1980, for court costs of a suit against McKean's estate. Respondent neither filed suit nor returned the $73 or $125 to Dorothy Ruprecht. On October 28, 1981, respondent knowingly misrepresented to her that such a suit had been filed.

On June 20, 1979, Dorothy Ruprecht paid respondent $52 for court costs and fees in filing an unlawful detainer action against the tenants in her house on Ivy street.

The check was cashed by respondent at the Missouri Athletic Club. Although he eventually expended an approximately equivalent amount on such an action, he did not file the action until September 27, 1979, after Dorothy Ruprecht confronted him with his failure to file it. During those three months the tenants continued to not pay their rent. Dorothy Ruprecht's son changed the locks and the tenants moved out in October 1979 and subsequently she was able to rent the house to rent-paying tenants. Also in June 1979 Dorothy Ruprecht paid respondent $150 for "bond" when it came time to remove the tenants from the house. Although respondent never found it necessary to purchase the bond, the $150 was not returned to Dorothy Ruprecht until she complained of its nonreturn at her October 28, 1981, meeting with respondent.

In his capacity as attorney for the executor of Edward Ruprecht's estate, respondent initialed the handwritten notation on the 1982 report in lieu of annual settlement even though he knew the notation to be in error and thereby misrepresented to the court, Dorothy Ruprecht and her son Edward, the executor, that the estate money was deposited in an interest-bearing account. However, we do not find Dorothy Ruprecht had the authority to instruct respondent to deposit the money in an interest-bearing account or to discharge respondent as attorney for the executor, and, in fact, we instead find her son, the executor, did not instruct respondent to deposit the money in an interest-bearing account and did not discharge respondent as his attorney. Additionally, while respondent neglected filing annual reports in a timely manner, we do not find his neglect of administrative matters caused the undue delay in closing the estate. Instead, the substantial part of the delay resulted from ongoing negotiations to repurchase the stock and from the delay, which he did not cause, in receiving a reissued check from the I.R.S.

■ A preponderance of the evidence demonstrates respondent violated DR 1–102(A)(3), (4) and (6), DR 6–101(A)(3), DR

7–101(A)(1) and (2), and DR 9–102(B)(3). Respondent's knowing misrepresentation to Dorothy Ruprecht that a lawsuit had been filed against McKean or his estate and his misrepresentation in the report in lieu of annual settlement filed in 1982 establish violation of DR 1–102(A)(4) and (6). We also conclude that respondent's conduct toward Dorothy Ruprecht establishes violation of DR 1–102(A)(3). *See Littleton,* 719 S.W.2d at 775–76 (discussing prohibition against engaging in illegal conduct involving moral turpitude). Additionally, respondent's failure to file a suit in the McKean matter or to apprise Dorothy Ruprecht of his decision not to, his failure to return the $73 and $125 to her, his delay in filing the unlawful detainer action and in returning the "bond" money to her, and his failure to timely file annual reports on behalf of the executor of Edward Ruprecht's estate proves violation of DR 6–101(A)(3) and DR 7–101(A)(1) and (2). Furthermore, respondent's inability to properly account for why some of the money was paid to him by Dorothy Ruprecht, his failure to properly return money to her and his cashing of the $52 at the Missouri Athletic Club demonstrates violation of DR 9–102(B)(3). Respondent's motion to dismiss the charges was properly overruled.

## IV. *Discipline*

"In deciding the appropriate sanction, we recognize that the primary purpose of this proceeding is not to punish respondent, but to inquire into his fitness to continue as an attorney." *Williams,* 711 S.W.2d at 521. "Any discipline imposed has as its objective the protection of the courts and the public and maintenance of the integrity of the profession and the courts." *In re Maier,* 664 S.W.2d 1, 2 (Mo. banc 1984).

This is not a proper case for reprimand because respondent's breach of discipline was not an isolated act and did involve dishonest, fraudulent, or deceitful conduct on the part of the attorney. *Littleton,* 719 S.W.2d at 777. Nor is suspension sufficient in this case. Respondent continued to practice law even though he had been suspended automatically for failure to pay annual enrollment fees. Suspension has not protected the public from respondent's misconduct in the past and we cannot expect it to in the future. Instead, disbarment is the only sanction which in this case sufficiently can protect the public and maintain the integrity of the profession.

■ "Where an attorney has committed an act of fraud, dealt in a purposefully dishonest manner with a client, or sought to enrich himself dishonestly at the expense of others, disbarment is the appropriate sanction." *Id.* at 778. "Certainly where an attorney misappropriates a client's funds, protection of the public is uppermost in our minds and disbarment is generally appropriate in such cases." *Williams,* 711 S.W.2d at 522. Respondent continually neglected legal matters entrusted to him, knowingly deceived his client, and failed to return money to his client paid to him for the filing of lawsuits never filed, all while he was suspended from the practice of law in Missouri for failure to pay enrollment fees. Under these circumstances, we have no alternative but to disbar respondent.

Respondent is ordered disbarred.

All concur.