**In re Terry B. CROUPPEN and Myron S. Zwibelman, Respondents.**

**No. 68424.**

Supreme Court of Missouri,
En Banc.

June 16, 1987.

Canice Timothy Rice, Jr., St. Louis, for the Bar Committee.

Charles Alan Seigel, Peter T. Sadowski, St. Louis, for respondents.

ROBERTSON, Judge.

This is a disciplinary proceeding instituted by the Bar Committee of the Twenty-Second Judicial Circuit pursuant to Supreme Court Rule 5. On July 17, 1986, the Bar Committee filed an information in this Court charging respondents Terry B. Crouppen and Myron S. Zwibelman, attorneys and partners engaged in the practice of law in the City of St. Louis, Missouri, with violations of Rule 4, DR 2–103(A) and DR 2–103(B) (1981). This Court appointed the Honorable Edward D. Hodge, Presiding Judge, Twelfth Judicial Circuit, Special Master. The Master conducted a hearing and entered findings of fact and conclusions of law.

I.

On or about April 11, 1981, Virgil Brown, a Missouri Pacific Railroad employee, injured his back and groin while on the job. He apparently called two attorneys in the St. Louis area, Marshall Friedman and Robert F. Ritter and talked with each of them about handling his injury claim. On April 21, 1981, Brown signed a contingent fee contract with Mr. Ritter.

On April 28, 1981, Brown entered Normandy Osteopathic Hospital to undergo surgery for his injuries. In the early evening of April 28, respondents Crouppen and Zwibelman, though uninvited, arrived at Brown's hospital room. Brown testified that Zwibelman had called him on the telephone prior to coming to the hospital and that during that telephone conversation, Brown told Zwibelman he already had an attorney. Brown's wife, Chisena Brown, and a family friend, Linda White, were with him in the hospital at the time of respondents' visit. The Browns and Ms. White have different recollections about the events which took place at the hospital. Mrs. Brown testified that Mr. Brown informed respondents that he had a lawyer with whom he was satisfied. Ms. White testified that Mr. Brown informed respondents that he had "talked" to Mr. Ritter but that Brown never indicated that he and Ritter had entered into a contract.

Respondents spoke with Brown for approximately 15 minutes. Brown, by his own account "somewhat confused—being in pain and whatnot," recalls that respondents denigrated Mr. Ritter's legal abilities and extolled their own virtues as attorneys, offering to make him rich and match or beat any fee for which any other attorney would handle his case. Neither Mrs. Brown nor Ms. White testified concerning comments about Ritter's ability. Mrs. Brown did recall, however, that respondents made positive comments about their ability to handle Brown's case.

After apparently suggesting that Brown consider hiring them and, according to Brown, encouraging him to discharge Ritter, respondents left the hospital room. Brown testified that Zwibelman made subsequent telephone calls to him asking whether Ritter had been discharged. On or about April 29, Brown received a bouquet of helium-filled balloons. With the balloons was a card inscribed, "Best wishes for a speedy recovery. The law firm of Brown, Crouppen, Walther and Zwibelman."

For their part, Crouppen and Zwibelman testified that one of their clients, a Larry Clark, had called the law firm, indicating that his friend, Virgil Brown, was in the hospital and in need of an attorney as a result of work-related injuries. According to respondents, Clark's call prompted them to visit the hospital on the way home from the office. Respondents deny any disparaging comments about Ritter's abilities. After leaving the hospital, respondents claim they were unsure whether they had left a business card with Brown. The balloons were intended to assure that Brown knew their firm name. Respondents further deny ever speaking with Brown on the telephone—either before or after the hospital visit.

On May 2, 1981, Brown called Mr. Ritter and related the story of respondents' visit in the hospital room. Ritter called Zwibelman telling him to stay out of Brown's hospital room and suggesting that he would turn the matter over to the Bar Committee for further investigation. After Zwibelman related the substance of Ritter's call to Crouppen, Crouppen called Ritter. Crouppen informed Ritter that Brown was not telling him the truth. During the course of these conversations, one of the respondents, apparently attempting to justify his conduct, told Ritter, "Come on Bob, you know the rules of the game. This is a dog eat dog business."

The information filed against Crouppen and Zwibelman by the Bar Committee alleged that respondents' conduct violated Missouri Supreme Court Disciplinary Rules DR 2–103(A) and DR 2–103(B).

The Master found no violation of Rule DR 2–103(A) "as the evidence was insufficient to support a finding that Respondents were not requested by Mr. Brown to contact him concerning their possible employment. The evidence of Respondents was that a client of theirs, one Larry Clark, had called them and advised them that Mr. Brown wished to discuss his case with them." The Master found that the gift of the bouquet of helium-filled balloons violated Rule DR 2–103(B) [1] in that the balloons were "something of value" given for the purpose of securing employment as counsel to Mr. Brown. [2]

## II.

DR 2–103(A) provides: "A lawyer shall not, except as authorized in DR 2–101(B), recommend employment as a private practitioner, of himself, his partner, or associate to a layperson who has not sought his advice regarding employment of a lawyer." (Emphasis added). The rule seeks to preserve the professional ideal of the attorney-client relationship and is

"based in part on deeply ingrained feelings of tradition, honor and service. Lawyers have for centuries emphasized that the promotion of justice, rather than the earning of fees, is the goal of the profession." Comment, A Critical Analy-

---

**1.** DR 2–103(B) states:

A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client, except that he may pay the usual and reasonable fees or dues charged by any of the organizations listed in DR 2–103(D).

**2.** Respondents' argue that the balloons do not constitute "anything of value" within the mean-

ing of DR 2–103(B). The gift of balloons displays a remarkable lack of taste under these circumstances. Even assuming, *arguendo*, that the balloons constitute "anything of value" within the meaning of DR 2–103(B), the level of discipline we impose in this case would not increase. Therefore, we see no benefit to the public or the bar by a further expression of opinion regarding respondents' alleged violation of DR 2–103(B).

sis of Rules Against Solicitation by Lawyers, 25 U.Chi.L.Rev. 674 (1958).

\* \* \* \* \* \*

It is said that the prohibitions embodied in DR 2–103(A) ... serve to reduce the likelihood of overreaching and the exertion of undue influence on lay persons, to protect the privacy of individuals, and to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest.

\* \* \* \* \* \*

[T]he overtures of an uninvited lawyer may distress the solicited individual simply because of their obtrusiveness and the invasion of the individual's privacy, even when no other harm materializes.

*Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 460, 461, 465–66, 98 S.Ct. 1912, 1921, 1921, 1923–24, 56 L.Ed.2d 444 (1978) (footnotes omitted).

### III.

■ We have consistently stated that we are not bound by the Master's findings in disciplinary actions. *In re Littleton*, 719 S.W.2d 772, 775 (Mo. banc 1986). We review the evidence ourselves and decide all issues of fact necessary to a decision. *In re Frick*, 694 S.W.2d 473, 474 (Mo. banc 1985). Nevertheless, the written record before us in this case requires that we give some deference to the Master's ability to assess the credibility of the live witnesses appearing before him. *In re Jones*, 431 S.W.2d 809, 811 (Mo. banc 1966); *In re Woodward*, 300 S.W.2d 385, 387 (Mo. banc 1957). Guilt must be proven by a preponderance of the evidence. *Littleton*, 719 S.W.2d at 775.

### A.

We have carefully reviewed the transcript of the hearing in this case. Perhaps as a result of the unfortunately long period of time between the acts complained of and the hearing, the testimony of the witnesses as to respondents' conduct at the hospital is not conclusive. Further, the critical testimony of Larry Clark is not available. In response to this Court's inquiry at oral argument, respondents' counsel indicated that by the time of the hearing, Clark had become dissatisfied with respondents' representation of him. Therefore, neither respondents nor the Bar Committee subpoenaed his testimony at the hearing.

■ There is no confusion in the record on the critical point, however; respondents were uninvited guests at Virgil Brown's hospital bedside room prior to his surgery. It is further clear that both the purpose and the intent of their visit was to solicit Brown's legal business. DR 2–103(A) prohibits a lawyer from recommending his own or his partner's employment to a lay person who has not sought his advice. Virgil Brown did not personally seek respondents' advice. Therefore, respondents' uninvited attendance at Virgil Brown's bedside violated DR 2–103(A).

### B.

We turn now to issues of aggravation and mitigation. Respondents testified that their former client, Larry Clark, called them, indicating that Virgil Brown wished to see them about his accident. The testimony regarding Clark's call tends to explain respondents' knowledge of Brown's injury and hospitalization. Clark's call does not justify respondents' violation of DR 2–103(A); it merely serves to lessen the severity of that violation.

The observation that this is a "dog eat dog world" is particularly troubling in this context. Far from excusing respondents' actions, the statement betrays a mindset inimical to the standards of conduct which govern the legal profession. Our society depends on a willing majority's steadfast fidelity to the rule of law to keep us from the anarchy which respondents' "dog eat dog" comment describes. As officers of the court, respondents have the high calling and the freely accepted, special obligation of allegiance to that rule of law which the profession demands. By losing sight of their duties to society and their profession, and in placing their personal interests above those duties, Crouppen and Zwibelman take their place among those

who would sully the reputation of the legal profession.

### C.

We come finally to the question of appropriate sanction. The purpose of discipline is to protect the public and maintain the integrity of the legal profession. *Frick,* 694 S.W.2d at 479. Discipline also serves to educate the members of the bar and the public concerning unethical conduct; such education has a deterring influence.

The record contains no evidence of prior breaches of professional ethics by these respondents. Mitigating circumstances exist. A public reprimand is appropriate where an attorney's breach of discipline is an isolated act, not involving dishonest, fraudulent or deceitful conduct. *Littleton,* 719 S.W.2d at 777. Under these circumstances, a public reprimand satisfies the purposes of discipline.

It is therefore ordered that respondents be publicly reprimanded.

HIGGINS, C.J., BILLINGS, BLACKMAR, DONNELLY and WELLIVER, JJ., and FINCH, Senior Judge, concur.

RENDLEN, J., not sitting.