**In re John J. CAREY, Respondent.**

**In re Joseph P. DANIS, Respondent.**

**Nos. SC 84189, SC 84190.**

Supreme Court of Missouri,
En Banc.

Nov. 26, 2002.

478

Sharon K. Weedin, Office of Chief Disciplinary Counsel, Jefferson City, for Informant.

Martin M. Green, Clayton, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

It is a fair characterization of the lawyer's responsibility in our society that he stands "as a shield," to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries been compendiously described as "moral character." *Schware v. Bd. Of Bar Exam'rs,* 353 U.S. 232, 247, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring).

The Chief Disciplinary Counsel (CDC) filed a three count information against attorneys John J. Carey and Joseph P. Danis based upon their alleged professional misconduct in prosecuting product liability class action suits against a former client, the Chrysler Corporation, and in making misrepresentations in discovery in the subsequent lawsuit for breach of fiduciary duty brought by Chrysler against them. We find that both John Carey and Joseph Danis engaged in professional misconduct by representing another person in a substantially related matter adverse to the interest of a former client in violation of Rule 4–1.9(a) [1], Rule 4–8.4(a) [2], and by making false discovery responses in violation of Rule 4–3.3(a)(1) [3], Rule 4–8.4(c) [4], Rule 4–8.4(d) [5], Rule 4–3.4(a) [6] and Rule 4–3.4(d) [7]. John J. Carey and Joseph P. Danis are indefinitely suspended from the practice of law, with leave to apply for reinstatement not sooner than one year from the date of this opinion.

## I. Factual Background

 In a disciplinary proceeding, the Disciplinary Hearing Panel's "findings, conclusions, and recommendations are advisory in nature. This Court reviews the evidence *de novo,* determines independently the credibility, weight, and value of the testimony of the witnesses, and draws its own conclusions of law." *In re Oberhellmann,* 873 S.W.2d 851, 852 (Mo. banc

1. "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." Rule 4–1.9(a).

2. "It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." Rule 4–8.4(a).

3. "A lawyer shall not knowingly make a false statement of material fact or law to a tribunal." Rule 4–3.3(a)(1).

4. "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Rule 4–8.4(c).

5. "It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice." Rule 4–8.4(d).

6. "A lawyer shall not unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act." Rule 4–3.4(a).

7. "A lawyer shall not in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort [sic] to comply with a legally proper discovery request by an opposing party." Rule 4–3.4(d).

1994). In attorney disciplinary proceedings, the truth of the allegations must be established by a preponderance of the evidence. *In re Howard,* 912 S.W.2d 61, 63 (Mo. banc 1995). "The purpose of attorney discipline is to protect the public and maintain the integrity of the legal profession." *In re Caranchini,* 956 S.W.2d 910, 918–919 (Mo. banc 1997). We find the following facts:

## A. Representation of Chrysler by John Carey and Joseph Danis

John Carey joined Thompson & Mitchell in 1987, after being admitted to practice law in Missouri. While at Thompson & Mitchell, Carey worked under Charles Newman as part of a "team" of partners and associates that defended Chrysler against product liability and consumer class action cases brought against it nationwide. From January 1992 through December 1995, Carey billed 1,314.6 hours to Chrysler. As part of the Chrysler team, Carey was privy to all aspects of the Chrysler representation and directly participated in nearly all aspects of the Chrysler litigation. In addition, Carey assessed Chrysler's potential liability in pending litigation and helped draft a "blueprint" for Chrysler to follow in defending class action product defect suits pending concurrently with a National Highway Traffic Safety Administration ("NHTSA") investigation.

Joseph Danis was licensed to practice law in Missouri in 1993 and began work as an associate for Thompson & Mitchell that year. Carey acted as Danis' mentor while Danis was a summer associate and again when Danis was a new associate. Danis joined Carey as a member of Charles Newman's Chrysler team. As a new associate, Danis' involvement with the Chrysler class action litigation was less extensive than Carey's. However, as a member of the team, Danis was privy to all aspects of the Chrysler representation. Danis billed 513.5 hours to Chrysler from January 1992 through December 1995.

Newman would circulate information on the widest possible basis to every member of the Thompson & Mitchell team involved in representation of Chrysler. Carey was the primary associate on four different Chrysler class action cases.[8] Charles Newman testified:

> John [Carey] was totally immersed in that case [*Osley*], along with me, and played the same role that I played in many respects. And that obviously involved ... determining the legal issues that the case presented. It also involved analyzing the jurisdiction ....
>
> ....
>
> He was also involved with me and others in massing the facts relevant to the claims that were asserted, and that involved contacting and principally working with the personnel in the office of the general counsel at Chrysler Corporation.

Newman further testified that in the other three cases, Carey had "a similar role with a few additional aspects."

Danis was not involved in *Osley,* but did participate in the other three cases. Danis was involved in the lower level associate functions, but worked extensively with both Newman and Carey. Danis worked principally on drafting discovery responses and obtaining information from Chrysler to respond to discovery requests.

The component parts involved in the class action lawsuits Carey and Danis defended while with Thompson & Mitchell were Renault heater coils and Chrysler minivan door latches. Charles Newman

---

**8.** These cases are referred to as *Osley, Larpenteur, Peterson* and *Drake. Osley* involved heater cores while the other three cases each involved Chrysler minivan gate latches.

and other Chrysler attorneys, William McLelland and Lewis Goldfarb, each stressed, however, that the actual defective component was not materially important in this type of class action lawsuit. Goldfarb testified:

> The products at issue in class actions are almost irrelevant to how we go about defending class actions. There's almost an identity of process in terms of how we defend class actions, regardless of the nature of the component involved.
>
> . . . .
>
> Product-related class action[s], particularly those that follow on the heels of a government investigation, are virtually identical in the way the company handles them. The nature of the component involved is almost irrelevant to these cases because they never go to trial. We're always dealing with the government, that investigation relates to the ongoing class action case. And the class action strategy is almost independent in some respects of the nature of the component involved.

These three Chrysler attorneys also testified that respondents Carey and Danis were privy to a wealth of information that would be useful to them in prosecuting a product-related class action against Chrysler. Newman testified that Carey and Danis learned Chrysler's strategy in defending minivan product liability class action suits:

> Respondents [were] present during meetings with in-house Chrysler counsel when there was a discussion of the strengths and weaknesses of various Chrysler employees . . . [and] with non-lawyer Chrysler employees; for example, expert witnesses.
>
> . . . .

> We would talk with the client about other pending litigation alleging a similar product or defect . . . . So we would talk to the attorneys at Chrysler about their defense of those cases, what factual defenses were being developed and implemented, what expert witnesses, if any, they were working with there. The legal strategies in those cases, the legal defenses in those cases. Determine their applicability, determine their usefulness, determine whether they could be implemented in the class action . . . .

Newman also said that Carey and Danis knew that Chrysler was very hesitant to interplead or sue a critical supplier because of the way its supply lines were managed.

> [I]f somebody was thinking of suing Chrysler and knew . . . that Chrysler had a predisposition against bringing in third parties, you would know in contemplating a suit against Chrysler that it would be relatively efficient in that Chrysler wouldn't bring in everybody else in the world that might be involved or had a bearing with that particular component or product and that you could tailor your claims accordingly to focus just on Chrysler and not have to worry about suppliers and the like.

Newman testified that, although the component parts differed, there were many similarities in available defenses, such as statute of limitations, improper certification of the class, improper class representatives, and improper assertion of claims. Finally, Newman indicated that many expert witnesses overlap: economists, automotive repair experts and human factor engineers.[9] Newman testified that "[t]he Respondents . . . learn[ed] which experts Chrysler chose to use and

---

9. A human factor engineer would testify that a recall as opposed to a class action lawsuit is the best stimulus for an owner to get the vehicle repaired.

not use." He stressed that Carey and Danis helped formulate Chrysler's defense strategy in class action product liability cases involving Chrysler minivans.

William McClelland confirmed that Carey and Danis were "made aware about the types of information Chrysler kept, the sources of information within Chrysler relevant to the defense of a product liability class action lawsuit involving the minivan." McClelland testified that respondents' specific knowledge of the minivan would be extraordinarily helpful.

[T]he minivan was incredibly important to Chrysler. It still is today. I'm not sure the public fully understands its importance to our profitability. They know Chrysler makes solid minivans, but not I think the importance that we attach to it internally.

We were just coming out with a brand-new minivan at the time. We had put over a billion dollars investment into that minivan and were very concerned from a marketing and public relations perspective.

One of the strategies of the plaintiffs' bar would be to muddy our name. We noticed during that time Ford was coming out with ads touting its safety record.

Carey's and Danis' first-hand knowledge of the minivan's importance would allow them to "know what hot buttons to push."

Lewis Goldfarb also discussed respondents' work for Chrysler. Goldfarb testified that Carey and Danis had access to "detailed, internal information and analysis done by the in-house legal department, as well as [Chrysler] engineers and other personnel, regarding the status of a confidential government investigation . . . ." He emphasized that Carey and Danis had a "road map as to how we [Chrysler] look at and analyze alleged defects concerning our products."

The "road map" Goldfarb spoke of referred to a "matrix" or "blueprint" that the Chrysler team—including John Carey and Joseph Danis—developed to formulate Chrysler's defense to class action product liability cases involving Chrysler minivans. The team prepared a matrix of all considerations that Chrysler should consider in deciding whether or not to settle the minivan latch cases. This matrix listed relevant criteria and matched those criteria with a factual scenario. For each scenario, the team gave thoughts about the applicability of the criteria and its impact on the company. The matrix also included a form of a decision tree. The decision tree visually described the different scenarios and their implication on important areas of the company like marketing, public and consumer relations, dealer relations, and the recall itself.

This information was very important to Chrysler. Charles Newman summed up Chrysler's position on the matrix in saying:

[T]his is highly confidential information and it was shared with us by our client in confidence. We had a discussion, extensive discussions with the client that resulted in the creation of this document, this matrix or template. And to have a plaintiff's lawyer know, for instance, of the very considerations themselves what Chrysler's thought process deemed important and deemed material and how I in representing them analyzed each of those aspects would be very sensitive, confidential information that neither the company nor I would want to share with anyone.

### B. Carey & Danis, L.L.C.—The Chrysler ABS Class Action

In January 1995, Carey and Danis left Thompson & Mitchell and formed their

own firm, Carey & Danis, L.L.C.[10] Carey & Danis shared office space with the firm of David Danis—Joseph Danis' father—Danis, Cooper, Cavanagh & Hartweger, L.L.C. The two firms shared staff, a bookkeeper, a fax machine, and unlocked (but separate) filing cabinets.

In August 1995, a Thompson & Mitchell secretary referred her brother-in-law, Dennis Beam, to Carey & Danis after he experienced problems with the anti-lock brake system on his Chrysler minivan. Carey discussed the potential case with Beam. Carey, obviously aware that he and Danis had represented Chrysler, researched Rule 1.9 of the Model Rules of Professional Conduct for an hour or two to determine if a conflict existed. Carey testified that he "made the determination that since Joey [Danis] and I had no knowledge or information at all concerning anti-lock brakes ... that those were not substantially related under my review of the case law and reading those rules." Carey determined there was not a conflict. However, Carey & Danis did not file suit because Thompson & Mitchell had been referring business to them and they did not want to embarrass their former firm by filing suit against a former client.

Carey & Danis arranged for the Danis, Cooper firm to represent Beam and a class of plaintiffs against Chrysler. Danis, Cooper was to get help on the case from another St. Louis law firm, Blumenfeld, Kaplan & Sandweiss. Carey and Danis met with attorneys from Danis, Cooper and the Blumenfeld firm to discuss the *Beam* class action suit over lunch at a restaurant. According to Evan Buxner, who was working for Blumenfeld at the time, the "purpose of the meeting was to discuss generally if Blumenfeld, Kaplan &

Sandweiss participated in the litigation what our role was and what we might expect representing a plaintiff in a proposed class in a plaintiffs' class action case." Carey & Danis was the only firm with any significant class action litigation experience among the three firms. The firms discussed a number of topics relating to the class action against Chrysler: attorney time and cost, the fact that NHTSA was conducting an investigation into the brake system, that a proposed class action could ride the government coattails and let the government agency do most of the work, the effect of a recall on a potential class action, the necessity (or lack thereof) of hiring experts, and that they could expect a barrage of motions from Chrysler.

Shortly after their involvement began, Blumenfeld was informed that Carey & Danis' involvement in *Beam* was being investigated for conflict of interest. Blumenfeld then withdrew from the *Beam* litigation. Carey explained:

> Once they withdrew David [Danis] and Richard [Cooper] approached Joey [Danis] and I and asked us if we would be interested in getting involved in the case, we knew that there was no conflict of interest, and they needed help because ... there was a motion to transfer that was pending in St. Louis City. They needed help. There wasn't time to try and go out and find another co-counsel.

Carey & Danis entered their appearance on behalf of the *Beam* plaintiffs. However, neither Carey nor Danis sought or received Chrysler's consent to act as plaintiffs' counsel against Chrysler.

In December 1995, Joseph and David Danis met in New York with Stanley Grossman, an attorney who had a similar

10. Here the descriptive terminology gets somewhat confusing. When speaking of respondents individually, they are referred to as

"Carey and Danis." When speaking of respondents' law firm, it is referred to as "Carey & Danis."

ABS class action suit against Chrysler in New Jersey. At the meeting they discussed joining—and later did join—the two class actions as well as a third group of plaintiffs from Mississippi represented by John Deakle. Following the meeting, Joseph Danis wrote Grossman to confirm the discussion regarding the ABS cases. Danis also inquired as to allocation of attorneys' fees if the cases were consolidated, saying there was "plenty of money for all .... Consequently, we will all be better served working together against Chrysler ...." This correspondence has been termed "the Grossman letter."

While Danis and his father were in New York meeting with Grossman, Carey received a letter from Charles Newman accusing Carey & Danis of having a conflict of interest in the *Beam* case. Carey was "very upset" upon reading Newman's letter and immediately called Newman to tell him that he believed "in the strongest terms that [Carey & Danis] did not have a conflict of interest," but that he did not want to cause any trouble with Newman, Thompson & Mitchell, or Chrysler. Carey inquired if they could put an end to "all this ugliness and nastiness" if he and Danis withdrew from the *Beam* case. Newman did not make any promises, but thought that might appease Chrysler.

Thereafter, the *Beam* case was voluntarily dismissed and then joined with Grossman's case in New Jersey. Carey & Danis withdrew from *Beam*, but the Danis, Cooper firm and John Deakle were among the attorneys listed for the plaintiffs. Carey & Danis associated with a group of

class action attorneys—David Danis and John Deakle, among others[11]—that often worked together on cases and shared information. A number of these attorneys were involved in Chrysler ABS litigation. Members of this group would forward correspondence regarding the ABS litigation to each other and many of these communications would find their way to Carey & Danis.

### C. *Chrysler v. Carey & Danis*—False and Misleading Statements

Respondents Carey and Danis notified their malpractice insurer of a potential lawsuit by Chrysler and gave the insurer copies of documents that could be relevant—including the Grossman letter. The insurer later met with Lou Basso, the attorney Carey and Danis had chosen to represent them.[12] The insurer gave the documents respondents had compiled to Mr. Basso. Basso made copies and then returned the documents to the insurer. Carey and Danis had also given the original Grossman letter to Basso, along with some other documents, when Basso was originally retained.

On March 26, 1996, Chrysler sued Carey & Danis for breach of fiduciary duty and respondents were served with process. Chrysler alleged that Carey & Danis, though not attorneys of record, assisted a group of lawyers in prosecuting ABS class action claims against Chrysler. Chrysler served interrogatories and requests for production upon both Carey and Danis, individually.

---

11. Other members of the group included J.L. Chestnut, who filed an ABS class action case against Chrysler in Alabama, Joseph Phebus of Illinois, and Richard Paletta.

12. Respondents initially hired Lou Basso as their attorney in their conflict of interest case against Chrysler. Later, Respondents were informed that their insurer would not pay for

Basso to represent them. Respondents then hired Richard Weustling to represent them. Basso remained named as a counsel of record, even though his involvement had ceased. When Respondents' insurance coverage ran out, they again hired Basso as their attorney. Basso represented Carey and Danis at trial.

Between March 26, 1996 (when respondents were served) and October 28, 1996 (when respondents submitted sworn discovery answers), there was a good deal of communication between the members of the group. Among these communications was a series of letters and faxes regarding Chrysler ABS cases from members of the group that were either sent directly or carbon copied to either Carey & Danis or respondents individually. However, both Carey and Danis testified that only a few of these documents actually made their way to their desks. Respondents had instructed their staff that Carey & Danis was not to get any Chrysler materials and that such correspondence should be given to David Danis. The instruction to "cut-off" any correspondence regarding Chrysler remained, even after discovery in *Chrysler v. Carey & Danis* had begun and Chrysler had specifically requested such documents.

Despite their denials, Carey & Danis' involvement in the prosecution of the class action lawsuits against Chrysler continued. On March 28, 1996—only two days after he and Danis were served with process—Carey dictated a memorandum to the file regarding the potential use of a witness named Sheridan. Carey stated, "Sheridan should be useful in two respects: (1) as an expert witness in the New Jersey ABS case regarding defects in Chrysler's anti-lock braking system; and (2) as a fact witness in Chrysler's suit against us regarding Chrysler's outrageous and abusive practices."

Carey told Richard Paletta, a lawyer in the group, about the Alabama Chrysler ABS case over lunch one day. Carey explained that the case was filed in Alabama because David Danis was concerned about getting cut out of the attorneys' fees in the New Jersey case.

On October 28, 1996, both Carey and Danis provided sworn answers to identical sets of interrogatories. Interrogatory No. 2 to each was as follows:

State whether you have communicated with anyone (other than Dennis Beam and ... any employee of Carey & Danis, L.L.C.) regarding the subject matter of the St. Louis, Hattiesburg, or New Jersey class actions referenced ..., or the class action suit *Betty Brown, et al. v. Chrysler Corp. et al.*, filed in the Circuit Court of Sumter County, Alabama. For each such communication, state the following:

a. the time and place at which it was made;

b. the name and address of each person who was a party to such communication;

c. the substance of the communication providing as much detail as possible;

d. identification of any document or recording relating to such communication.

Respondents each provided the following sworn answer:

ANSWER:

a. from time to time, the exact dates are unknown;

b. David Danis, 8482 Maryland Ave., St. Louis, Missouri 63105;

c. these were casual conversations that took place, over lunch, as to what was going on with the New Jersey case.

d. no such documents exist.

Document Request No. 12 requested each respondent to produce "any correspondence, memoranda, or notes relating to the subject matter" of the cases mentioned in Interrogatory No. 2. Carey and Danis both answered: "No such documents are in the possession of Defendants."

The lawyers representing Chrysler did not believe Carey's and Danis' answers to

their interrogatories. Chrysler subpoenaed other members of the ABS group: Mr. Phebus in Illinois, Mr. Deakle in Mississippi, and Danis, Cooper. Chrysler also obtained federal court orders pertaining to these documents. These efforts resulted in the production of forty-two pieces of correspondence that were not produced by either Carey or Danis. After the documents were ordered produced, Joseph Danis wrote a letter to members of the group asking them to not send Carey & Danis any correspondence involving Chrysler litigation, as Carey & Danis did not have "any involvement in this litigation." Respondents explained their failure to identify or acknowledge the existence of the documents by saying they had never seen them or had seen them but forgotten about them, thrown them away, or given them to David Danis. Respondents did not forget about the meeting with Blumenfeld lawyers discussing the *Beam* case,[13] but claimed it was not subject to the interrogatory because it was "presuit." Respondents also consistently defended this conduct by blaming their attorney, even though they reviewed and signed their own interrogatories. For example, when asked about his answer to Interrogatory No. 2, Carey answered, "It was prepared by my attorney. I believed it to be true, honest, and correct at the time." Joseph Danis went so far in his Disciplinary Hearing testimony as to question whether or not he even saw his interrogatory answers. Danis testified:

> I don't have any recollection of ever seeing those requests.
>
> . . . .
>
> It's come to my attention that my attorney received a request for production of documents directed at my firm and myself as well as my partner.
>
> . . . .
>
> Again, it's come to my attention that Mr. Wuestling prepared a response. I have a vague recollection that Rick had prepared a response and wanted me to sign the response. I have no recollection reviewing any interrogatories or document requests, or executing them.
>
> . . . .
>
> Now I have reason to believe that I never executed my interrogatories.

However, in his deposition testimony, Danis specifically said, "I actually recall this being sent for my execution" and that he reviewed the responses for their authenticity and genuineness.

On March 13, 1997, Judge Perry of the Federal District Court for the Eastern District of Missouri entered discovery orders in the case. With respect to Document Request No. 8, Judge Perry ordered both Carey and Danis to produce "all documents that pertained or referred to actual or anticipated litigation against Chrysler Corporation regarding any anti-lock brakes, heater cores or vehicle latches." Pursuant to Document Request No. 25, Judge Perry ordered production of "all documents which refer or relate to fee sharing or joint representation agreements with any attorneys or law firms concerning a client represented by Carey & Danis." Again, each respondent failed to provide any such documents to Chrysler and each responded, "With regard to matters in which Chrysler was a party, no such documents exist. Defendant never had a fee arrangement on the *Beam* case or any Chrysler matter, and defendant has never

---

**13.** It was at this meeting that the Carey & Danis, Danis Cooper, and Blumenfeld firms discussed attorney time and cost, the ongoing NHTSA investigation, the effect of a recall, potential expert witnesses, and what motions plaintiffs could expect from Chrysler in the *Beam* case.

received any fee derived from any matter related to Chrysler."

*Chrysler v. Carey & Danis* went to trial in September 1998. On the fourth day of trial, respondents' attorney, Lou Basso, sought to use the Grossman letter to impeach some evidence. Chrysler's attorneys realized that the letter had never been produced during the course of discovery—even after the appearance of the forty-two documents and Judge Perry's prior discovery orders. Chrysler moved to strike Carey & Danis' answer.

The Grossman letter states in pertinent part:

Gentlemen:

Both my father, David Danis, and I enjoyed meeting with you last Sunday. We look forward to working with you in this matter and the other matters we discussed in the future.

We have preliminarily discussed your suggestion of consolidating our cases and pursuing the matter [in New Jersey]. Your suggestion has merit, and we are seriously entertaining the invitation . . . .

Please provide us with a general analysis of what you anticipate our role in the litigation would be if we consolidated our case, the Mississippi case and join the other plaintiffs we have lined up in other states to your suit. It is my suggestion that we negotiate some percentage of attorney fee allocation at the outset to protect both of our interests, and leave some flexibility for the remainder so that it may be adjusted according to the amount of work and contribution provided by each party in the litigation . . . .

. . . .

This case has good merit and there will be plenty of money for all of the participants . . . .

. . . .

Very truly yours,

CAREY & DANIS, L.L.C.

/s/ Joseph P. Danis

Respondents' position regarding their failure to identify this letter is somewhat inconsistent. First, they maintain that the Grossman letter is not subject to the order because there was never any actual fee agreement. With respect to the letter, Carey testified, "There is a proposal to share legal fees. There's no written agreement or arrangement that I'm aware of that ever existed." In the alternative, respondents maintain that failure to produce the letter was out of inadvertence or negligence, not dishonesty.

Respondents' attorney, Lou Basso, explained that at the trial there "was reference to the New Jersey litigation as a conspiracy in opening statement" and that this was "sort of a . . . twist that happened at trial and we didn't know where they were going with it." Basso "asked [Danis] and [Carey] the night before if they had any airline tickets, or anything like that, to prove that they had gone out to New Jersey, or anything. And they thought in [sic] having this." Basso asked them if they remembered the letter and "they looked at [him] shocked. They didn't even remember writing the letter." Basso found the letter "in a black notebook on some documents that [he] had received very early on in the lawsuit." He testified that he remembered these events specifically, because "Joe [Danis] looked at me and goes, 'Well, where did you get this? Where did this come from?' "

Joseph Danis' testimony at the disciplinary hearing was slightly different and somewhat inconsistent. First, Danis said he remembered the letter vividly.

Q: (By Ms. Church) Well, do you remember it?

A: Yeah, I remember it vividly.

Q: That's the letter ... dated December 13, 1995 to Stanley Grossman?

A: That's correct.

. . . .

Q: (By Ms. Church) Do you recall writing this letter?

A: Yes, I do.

However, later in his testimony, Danis testified:

Q: So one of your lawyer's had it?

A: That's correct.

Q: You knew it existed?

A: I didn't recall that it existed. In fact, I had forgot about it until sometime during the middle of trial Lou [Basso] showed us this letter.

Q: Would you agree with me that it was never turned over in response to the request for production of documents for the interrogatory answer?

A: It was turned over to our attorneys through our insurance carrier. And what they turned over to Chrysler I don't know. I did not review all the documents that were turned over.

Danis testified that, even before he and Carey had been served in the *Chrysler v. Carey & Danis* lawsuit, Carey & Danis' malpractice insurer turned over the Grossman letter to Mr. Basso. Danis testified that Basso gave Carey & Danis' other attorney, Rick Wuestling, some of the documents, but did not give Wuestling the Grossman letter out of inadvertence. Danis did confirm that during trial, Basso remembered the letter and "went and grabbed it for the purpose of cross-examination ...."

Judge Perry did not believe that failure to produce the document was out of mere inadvertence. After reviewing respondents' answers to Chrysler's interrogatories and requests for production along with the Grossman letter and the other alleged-

ly responsive documents, Judge Perry struck respondents' answer. In discussing the appropriateness of her sanction, Judge Perry commented at length on respondents' conduct:

I, as I told you, assumed that all lawyers were telling the truth, because I believe that's what our profession requires of us.

. . . .

I was shocked to see all of this communication between Mr. Carey and Danis and these lawyers, but I figured they had an explanation .... [referring to the forty-two documents found by Chrysler and not produced by Respondents]

. . . .

I know that lawyers are busy, but I don't know how a lawyer could forget a trip to New Jersey to talk about anti-lock brake litigation. Of course, it didn't have to be a trip to New Jersey.... It says I enjoyed a meeting with you last Sunday. Sunday afternoon meetings with attorneys in my experience are not something that people inadvertently forget.

. . . .

I don't believe that I can let this case just sit in the normal remedy of let the jury see that ... they were lying. The problem is this. It's deeper. These are lawyers, I don't know if this jury is going to come out of here thinking that's just how lawyers are .... [T]he defense in this case, although I have not allowed all of this to be presented to the jury, has somewhat been all lawyers cheat and lie, therefore what we did wasn't so bad. I'm not saying that's really the defense you have presented, but the implication has been there, and so I'm concerned ... [that the jury] will think that's what we all do, and I have to tell

you gentlemen, our profession is better than that. We don't all do that. We don't all do that.

This is the most egregious abuse I have seen in my court. . . .

. . . .

What [the Grossman letter] tells me is that we're not following the normal rules of discovery . . . . [T]he problem I have is [the Grossman letter] makes me think it's the tip of the iceberg; makes me think that disclosure in this case has not been done in accordance with the rules of civil procedure, and so I no longer have faith in the process . . . .

. . . .

Why didn't your clients tell the truth about [the documents] when they were asked under oath? That's the problem Mr. Basso. You know, I've told you my opinion and I'm speaking very harshly, but I'm sorry, these are lawyers who lied, and that's not something I'm used to seeing. I assume every lawyer who stands in front of me is telling me the truth, and I can tell you that until this case, there is not a lawyer in this room or frankly very many in the Eastern District of Missouri who have not given me good reason to follow that assumption in every case. Most lawyers tell me the truth. Most lawyers do what they're supposed to do.

As a result of their answer being struck, a default judgment was entered against Carey & Danis in the amount of $850,000. The judgment was affirmed against Carey & Danis by the Eighth Circuit Court of Appeals in *Chrysler Corp. v. Carey*, 186 F.3d 1016 (8th Cir.1999).

## II. Discussion

### A. Count I: Conflict of Interest

■ Count I alleges professional misconduct by violating Rule 4–1.9(a), which governs conflict of interest with former clients. Rule 4–1.9(a) states:

A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation . . . .

It is not disputed that respondents Carey and Danis formerly represented the Chrysler Corporation, nor is it disputed that respondents' representation of the plaintiffs against Chrysler in *Beam* was materially adverse to Chrysler. The only issue presented is whether the *Beam* case was "substantially related" to Carey's and Danis' previous defense work for Chrysler.

■ "Gallons of ink" have been consumed by those trying to articulate or explain the test for deciding whether a substantial relationship exists between two representations. ABA/BNA Lawyer's Manual on Professional Conduct, 51:215. *See also Chrispens v. Coastal Ref. & Mktg., Inc.*, 257 Kan. 745, 897 P.2d 104, 111 (1995). The "substantially related" test was first announced in *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.*, 113 F.Supp. 265 (S.D.N.Y.1953). In announcing the rule, the court was primarily concerned with preserving client confidences and avoiding conflicts of interest.[14]

**14.** The primary "concern is the possibility, or appearance of the possibility, that the attorney may have received confidential information during the prior representation. . . . The test does not require the former client to show that actual confidences were disclosed. That inquiry would be improper as requiring the very disclosure" that the rule is intended to protect. *Chrispens*, 897 P.2d at 112. When a substantial relationship is found, this Court will presume that confidences were disclosed for conflict of interest purposes. *See id.;*

*T.C. Theatre*, 113 F.Supp. at 268–69. The court said:

> It would defeat an important purpose of the rule of secrecy—to encourage clients fully and freely to make known to their attorneys all facts pertinent to their cause. Considerations of public policy, no less than the client's private interest, require rigid enforcement of the rule against disclosure. No client should ever be concerned with the possible use against him in future litigation of what he may have revealed to his attorney. Matters disclosed by clients under the protective seal of the attorney-client relationship and intended in their defense should not be used as weapons of offense. The rule prevents a lawyer from placing himself in an anomalous position. Were he permitted to represent a client whose cause is related and adverse to that of his former client he would be called upon to decide what is confidential and what is not, and, perhaps, unintentionally to make use of confidential information received from the former client while espousing his cause. Lawyers should not put themselves in the position "where, even unconsciously, they might take, in the interests of a new client, an advantage derived or traceable to, confidences reposed under the cloak of a prior, privileged relationship." In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of his subsequent representation. If so, then the relationship between the two matters is sufficiently close to bring the later representation within the prohibition . . . .

*Id.* at 269 (citation omitted).

■ Other courts have also commented on the rule's purpose:

Westinghouse Elec. Co. v. Gulf Oil Corp., *588*

It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the rule is important for the maintenance of public confidence in the integrity of the bar. Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

*Kaselaan & D'Angelo Assoc., Inc. v. D'Angelo*, 144 F.R.D. 235, 239 (D.N.J. 1992) (citing *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984)). Important policies behind the rule include the promotion of "fundamental fairness . . . by prohibiting an attorney from using an informational advantage gained in the course of a former representation, the desire to promote client disclosure of all pertinent information . . ., and the desire to promote confidence in the integrity of the judicial system." *Columbus Credit Co. v. Evans*, 82 Ohio App.3d 798, 613 N.E.2d 671, 676 (1992).

There are three primary tests for substantial relationship used throughout the country. *See Chrispens*, 897 P.2d at 111. The first approach compares the facts of the former and current representations. *Id.* The second approach, which has not been widely adopted, insists that the issues involved in the two representations be identical or essentially the same. *Id.* The third approach, developed by the Seventh Circuit Court of Appeals, blends the fact and issue comparisons into a three-step test. *Id.* The Seventh Circuit test states:

> [D]isqualification questions require three levels of inquiry. Initially, the trial judge must make a factual recon-

F.2d 221, 224–25 (7th Cir.1978).

struction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978). The test "does not require the former client to show that actual confidences were disclosed. That inquiry would be improper as requiring the very disclosure that [MRPC 1.9(a)] is intended to protect." *Chrispens*, 897 P.2d at 112.

Missouri addressed substantial relationship in *State v. Smith*, 32 S.W.3d 532 (Mo. banc 2000). Our approach is consistent with that set out in *Westinghouse* and *Chrispens*, combining an analysis of both the facts and issues in determining substantial relationship. In *Smith* we said that the court "employs a focused approach, where the court examines the relevant facts of the case in order to determine whether the various matters are substantially related." *Smith*, 32 S.W.3d at 543. "[W]hether there is a 'substantial relationship' involves a full consideration of the facts and circumstances in each case." *Id.* at 542 (citations omitted). "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." Rule 4–1.9 cmt. The key to the analysis is whether there was a central issue common to both representations. *Smith*, 32 S.W.3d at 542–43.

■ The fact that a lawyer has previously represented a client does not automatically preclude the lawyer from opposing that client in a later representation.

The court must determine whether confidential information acquired in the course of representing the former client is relevant to the issues raised in the current litigation. *Chrispens*, 897 P.2d at 111. "The 'appearance' of impropriety must be more than a fanciful possibility. It must have a rational basis." *McCarthy v. John T. Henderson, Inc.*, 246 N.J.Super. 225, 587 A.2d 280, 283 (1991). The court's conclusion must be based on a close and careful analysis of the record. *Id.* Without such an analysis, the test serves "as a substitute for analysis rather than a guide to it. It is easier to find 'doubt' than to resolve difficult questions of law and ethics." *Id.* (citing *Realco Services, Inc. v. Holt*, 479 F.Supp. 867, 872 n. 4 (E.D.Pa. 1979)).

■ *Chrispens* offers a short, non-exclusive list of six factors that courts following the Seventh Circuit approach have considered in determining whether a substantial relationship exists. *See Chrispens*, 897 P.2d at 112. The factors include:

(1) the case involved the same client and the matters or transactions in question are relatively interconnected or reveal the client's pattern of conduct; (2) the lawyer had interviewed a witness who was key in both cases; (3) the lawyer's knowledge of a former client's negotiation strategies was relevant; (4) the commonality of witnesses, legal theories, business practices of the client, and location of the client were significant; (5) a common subject matter, issues and causes of action existed; and (6) information existed on the former client's ability to satisfy debts and its possible defense and negotiation strategies.

*Id.* (citations omitted). In some cases, one factor, if significant enough, can establish that the subsequent case is substantially related. *Id.* Careful review of the facts at

hand in relation to these six factors provides a specific framework for resolution of this case.

First, when compared to the prior representation, the ABS cases involve the same client, Chrysler. Because the cases all involve the Chrysler minivan in the same "type" of case, Chrysler's pattern of conduct is applicable despite the different specific component parts involved. It is undisputed that Carey and Danis defended the Chrysler Corporation on product liability class action lawsuits involving Chrysler minivan components and then later prosecuted a product liability class action lawsuit involving another minivan component against Chrysler. The subject matter of the lawsuits was components of Chrysler's minivan. Carey and Danis also knew how important the minivan was to Chrysler and had access to "detailed, internal information and analysis done by the in-house legal department . . . ." In fact, both Carey and Danis helped formulate the "blueprint" Chrysler used when defending a product liability class action suit involving the minivan.

Second, respondents interviewed or deposed a number of expert witnesses while working for Chrysler that could have been called to testify in the *Beam* lawsuit. Carey and Danis were present during meetings with in-house Chrysler counsel when there was a discussion of the strengths and weaknesses of various Chrysler employees and expert witnesses. Carey and Danis had personal contact with a number of expert witnesses that could be used in both cases and had learned which experts Chrysler chose to use and not use. Specifically, Charles Newman stated that " . . . I contacted some of the same experts for possible use in the defense of the ABS case that we had contacted in the defense of the *Osley* case." Two witnesses, Mr. Pat Gross, an auto mechanic, and Dr.

Mather, an economist, were mentioned by name and the general nature of their testimony common to these cases was briefly discussed.

Third, Carey's and Danis' knowledge of Chrysler's negotiation strategies were particularly relevant. Respondents helped formulate the decision matrix used by Chrysler when defending suits precisely like *Beam*. The matrix listed criteria Chrysler deemed relevant and matched those criteria with a factual scenario. For each scenario, the team gave thoughts about the applicability of the criteria and the impact on the company.

Fourth and Fifth, the commonality of witnesses, legal theories, and business practices of the client were significant, and there was a common subject matter as well as common issues and causes of action. This case involved the Chrysler minivan. Although the particular minivan parts at issue may have been different, in this case, testimony indicated that the actual components at issue in this type of product liability class action suit are almost irrelevant to how Chrysler defended the case. Lewis Goldfarb testified:

> Product-related class action[s], particularly those that follow on the heels of a government investigation, are virtually identical in the way the company handles them. The nature of the component involved is almost irrelevant to these cases because they never go to trial. We're always dealing with the government, that investigation relates to the ongoing class action case. And the class action strategy is almost independent in some respects of the nature of the component involved.

Finally, information existed on Chrysler's possible defense and negotiation strategies. As previously discussed, Carey and Danis knew of and actually helped

formulate Chrysler's defense and negotiation strategies.

Respondents' justification for prosecuting a consumer class action lawsuit involving Chrysler minivans, within one year after having represented Chrysler, was that the component parts were different. Carey and Danis defended Chrysler on Chrysler minivan door latch cases while *Beam* involved Chrysler minivan anti-lock brake systems.

■ Certainly, a client does not own a lawyer for all time. In appropriate circumstances our rules allow lawyers to take positions adverse to former clients and even to bring suit against them. *See* Rule 4–1.9. The similarity of each case and its facts and issues is the determinative factor. Rule 4–1.9, however, simply does not allow respondents to cut such a sharp corner here. This is why the rule is not limited to "the same" matter but also extends to "a substantially related" matter.

Upon a close examination of the facts and issues surrounding the respondents' representation of Chrysler, the fact that Carey and Danis defended Chrysler in product liability class action claims involving Chrysler's minivan overshadows the fact that different automotive parts were at issue. Respondents' work at Thompson & Mitchell allowed them access to information and strategy considerations that could not be turned fairly against their former client after changing employment. Although these lawsuits concerned different parts, the issues in the lawsuits and Chrysler's defense strategies were shown to be unavoidably linked. The expertise that Carey and Danis developed at Chrysler's expense and the confidences shared with them by Chrysler cannot be used by respondents to harm their former client.

■ "No client should ever be concerned with the possible use against him in future litigation of what he may have revealed to his attorney. Matters disclosed by clients under the protective seal of the attorney-client relationship and intended in their defense should not be used as weapons of offense." *T.C. Theatre*, 113 F.Supp. at 269. The public must have confidence in the integrity of the Bar and every "client has a right to expect the loyalty of his attorney in the matter for which he is retained." *Kaselaan*, 144 F.R.D. 235, 239 n. 5 (D.N.J.1992). "Every lawyer owes a solemn duty . . . to strive to avoid not only professional impropriety but also the appearance of impropriety." *Doe v. Perry Cmty. School Dist.*, 650 N.W.2d 594, 599 (Iowa 2002).

> It is this Court's duty to not only dispense justice, but equally important, to maintain the integrity of the judicial system. The public's trust and confidence in the system is essential to the ability of the system to function efficiently and justly. As this Court has previously noted "even an appearance of impropriety may, under the appropriate circumstances, require prompt remedial action . . . ."

*Contant v. Kawasaki Motors Corp.*, 826 F.Supp. 427, 429 (M.D.Fla.1993) (citation omitted).

By representing Dennis Beam in a products liability class action lawsuit against Chrysler, respondents Carey and Danis represented another person in a substantially related matter that was materially adverse to their former client in violation of Rule 4–1.9.

**B. Count II: Client Confidentiality**

■ Count II alleges that Carey and Danis violated Rule 4–8.4 by using confidential information obtained while representing Chrysler to later prosecute the ABS class action claim against Chrysler. The Disciplinary Hearing Panel found that

respondents did not violate Rule 4–8.4. We agree.

The Chief Disciplinary Counsel's contention is based in large part on the fact that respondents took over 800 pages of documents from Thompson & Mitchell when they left. The CDC argues that many of these documents were confidential and that Carey and Danis violated their duty of loyalty by using some of these documents as templates for the pleadings filed in the *Beam* case. The only specific document identified was a Chrysler petition used by Carey and Danis as a form for the *Beam* petition. The Chrysler petition had been filed and was thus a public record. It was not confidential.

W. David Wells, the head of litigation at Thompson & Mitchell when respondents left that firm, testified that he had reviewed the documents Carey and Danis had taken and did not find them to be confidential. Wells testified that most of the documents were either a matter of public record or were generic memos that could apply to a variety of clients. Wells further testified that he believed that it was not uncommon for lawyers to take copies of such documents when they leave one law firm for another.

Count II alleges specifically that respondents used confidential documents against Chrysler, and this must be proved specifically.[15] Given the testimony of those involved, the preponderance of the evidence supports a finding that respondents did not take confidential documents from Thompson & Mitchell and use them against Chrysler. We hold that respondents Carey and Danis did not violate Rule 4–8.4.

## C. Count III: False and Misleading Statements During Discovery

Count III alleges that both Carey and Danis, individually, submitted false discovery responses in *Chrysler v. Carey & Danis* in violation of Rules 4–3.3(a)(1), 4–3.4(a), 4–3.4(d), 4–8.4(c), and 4–8.4(d). Under these rules, a lawyer shall not knowingly make a false statement of material fact or law to a tribunal or offer evidence the lawyer knows to be false. Rule 4–3.3(a)(1), (4). "A lawyer shall not unlawfully obstruct another party's access to evidence or unlawfully ... conceal" any document or material having potential evidentiary value. Rule 4–3.4(a). A lawyer shall not "fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party." Rule 4–3.4(d). Finally, a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation" or "engage in conduct that is prejudicial to the administration of justice." Rule 4–8.4(c), (d).

 Discovery is a vital aspect of the truth-seeking mechanism of the adjudicative process. *State ex rel. Bar Ass'n v. Lloyd,* 787 P.2d 855, 859 (Okla.1990).

Any conduct that misleads one's adversary in the latter's search for truth anterior to trial impedes and impairs the integrity of forensic fact-finding process. All pretrial discovery, whether carried out by voluntary or involuntary means, must be treated alike .... In the con-

---

**15.** Under Rule 4–1.9(a) and the "substantially related" test, the primary "concern is the possibility, or appearance of the possibility, that the attorney may have received confidential information during the prior representation.... The test does not require the former client to show that actual confidences were disclosed. That inquiry would be improper as requiring the very disclosure" that the rule is intended to protect. *Chrispens,* 897 P.2d at 112. In Count II, however, the Informant charges a violation of Rule 4–8.4, by *actual procurement* of confidential documents. Accordingly, the Informant must specifically prove its allegation that Carey and Danis took confidential documents.

duct of our adversary litigation process no stage affords a license for an advocate's use of misleading tactics to impede or thwart the foe's legitimate pursuits.

*Id.* Abuse of the discovery process and misrepresentation to the court "is an affront to the fundamental and indispensable principle that a lawyer must proceed with absolute candor towards the tribunal. In the absence of that candor, the legal system cannot properly function." *Caranchini*, 956 S.W.2d at 919–20. "Honesty and integrity are chief among the virtues the public has a right to expect of lawyers. Any breach of that trust is misconduct of the highest order and warrants severe discipline." *In re Disciplinary Action Against Thedens*, 602 N.W.2d 863, 865 (Minn.1999). These principles are as applicable to lawyers who are party litigants as they are to lawyers serving in their representative capacity.[16]

▆▆▆▆ The CDC argues that respondents are collaterally estopped from denying the allegations of misrepresentation because the federal district court found that respondents had submitted false discovery responses.

The collateral estoppel doctrine precludes parties from relitigating issues of ultimate fact that have previously been determined by a valid judgment. Traditionally, collateral estoppel was limited by the concept of mutuality, which meant that a judgment could not be used for estoppel purposes unless both parties had been parties to the original judgment. However, this Court has since abandoned the mutuality requirement. Although collateral estoppel is more commonly invoked by defendants, it is also used by plaintiffs "offensively"

to estop defendants from relitigating issues that have been determined by a prior valid judgment. This Court has also approved a variation of the doctrine called offensive non-mutual collateral estoppel that may be invoked where the plaintiff was not a party to the earlier judgment.

. . . .

[F]our factors should be considered when applying non-mutual collateral estoppel: 1) the identity of the issues involved in the prior adjudication and the present action, 2) whether the prior judgment was on the merits, 3) "whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication," and 4) whether the party had a full and fair opportunity in the prior adjudication to litigate the issue for which collateral estoppel is asserted.

*In re Caranchini*, 956 S.W.2d 910, 912–13 (Mo. banc 1997) (citations omitted).

▆▆▆▆ Here, the only factor at issue is whether respondents "had a full and fair opportunity in the prior adjudication to litigate the issue for which collateral estoppel is asserted." Respondents had a full and fair opportunity sufficient to satisfy the requirements of due process. That conclusion is based on the Eighth Circuit's analysis of the issue:

[W]e find that Carey and Danis received a hearing adequate to satisfy the dictates of due process. The letter was brought to the court's attention shortly before the noon recess. Some discussion was had between counsel and the court as to the origin of the letter and why it had not been produced. The court then compared the letter to vari-

---

**16.** "[T]he Code of Professional Responsibility requires an attorney to comply with applicable disciplinary rules at all times, regardless of whether he is acting in a professional capacity." *In re Disciplinary Action Against Selmer*, 529 N.W.2d 684, 687 (Minn.1995).

ous interrogatories and document requests and determined that the responses to them were plainly false. The court also noted the connection between the letter and the forty-two documents introduced earlier. Counsel was then permitted to argue to the court on the issue of prejudice. After lunch, defense counsel was allowed to offer another explanation as to why the letter had not been produced, and there was a significant amount of discussion between counsel and the court. The court then recessed for about an hour to review interrogatories, document requests, the responses, and the record. After the recess, the court recapped the discovery in the case and presented its conclusion that sanctions were appropriate. The court then invited defense counsel to argue in support of a sanction less drastic than that asked for by Chrysler. Defense counsel did so at length in a soliloquy covering five pages of transcript. The court then struck the defendants' answer.

Contrary to the defendants' clear assertion, the district court did not decline to grant them a hearing "despite repeated requests" by the defendants. The record clearly shows no such requests were made prior to the imposition of the sanction. The following Monday morning, defense counsel was again allowed to argue against the sanction, and present segments of deposition testimony to bolster the claims made earlier that the letter had been innocently withheld. Defense counsel was also permitted to make an offer of proof on the testimony of Joseph Danis, if he were questioned about the creation and subsequent handling of the letter. However, we find nothing in the offer of proof that

is different from the arguments that had already been presented by defense counsel .... The lack of any new argument shows that Carey and Danis had a full opportunity to argue their case before the district court. Due process is satisfied if the sanctioned party has a real and full opportunity to explain its questionable conduct before sanctions are imposed.

*Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022–23 (8th Cir.1999).

 Accordingly, collateral estoppel applies. The federal "district court found that respondents repeatedly lied during the discovery process, denying the existence of conversations and documents which had in fact occurred and did exist." *Chrysler Corp. v. Carey*, 186 F.3d at 1021. Consequently, both Carey and Danis are estopped from denying these facts at this time. In applying this doctrine, we must make clear that the federal court sanctions are not used as a basis for automatic discipline. *In re Caranchini*, 956 S.W.2d at 912. The facts found in the federal proceeding are merely used to make an independent determination of whether the Missouri Rules have been violated. *Id.* Review of the record reveals substantial and persuasive evidence supporting the facts found by the federal district court.

 Both Carey and Danis, in their briefs to this Court, concede that their answers to Interrogatory No. 2 and Document Request No. 12 were inaccurate.[17] Neither Carey nor Danis revealed the meeting with Stan Grossman in New York where Joseph Danis and his father discussed joining *Beam* with Grossman's class of plaintiffs. Nor did either respondent reveal the luncheon meeting with attor-

---

**17.** Interrogatory No. 2 and Document Request No. 12 sought discovery of communications "with anyone ... regarding the subject

matter of the St. Louis, Hattiesburg, or New Jersey class actions ...."

neys from Danis, Cooper and the Blumenfeld firm at which they first discussed aspects of the *Beam* case. Respondents knew they were receiving correspondence from other attorneys regarding Chrysler ABS cases and still they answered "no such documents exist." Respondents knew that they discussed, even if casually, the Chrysler ABS cases with other lawyers and still they both identified David Danis as the only attorney with whom such communication was made. Respondents knew that Chrysler was specifically seeking discovery on these communications when they were served with interrogatories. Respondents each provided sworn answers to Chrysler's interrogatories on October 28, 1996. Carey & Danis received eleven pieces of correspondence after that date, yet neither respondent amended or supplemented the answers to their sworn interrogatories.

Judge Perry issued orders pertaining to a number of discovery issues, including Document Request Nos. 8 and 25. Request No. 8 required respondents to produce "all documents that pertained or referred to actual or anticipated litigation against Chrysler Corporation regarding anti-lock brakes, heater cores or vehicle latches." Request No. 25 sought "all documents which refer or relate to fee sharing or joint representation agreements with any attorneys or law firms concerning a client represented by Carey & Danis." Respondents told Chrysler and the court that "no such documents exist."

Respondents refuse to concede that their response to Request No. 25 is inaccurate. Both Carey and Danis go to great lengths in their respective briefs to analyze and dissect the term "agreement." Respondents contend that the distinction between "agreement" and "proposal" renders their answer to Request No. 25 truthful because there was never a final contractual fee agreement or joint representation agreement between Carey & Danis or any other firm in a suit involving Chrysler. While it is true that under contractual analysis there is a difference in meaning of "agreement" and "proposal," respondents walk too fine a line here.

The CDC cites four pieces of correspondence that are responsive to Request No. 25. Only the Grossman letter is addressed here as it is the most clearly egregious.[18] The Grossman letter stated:

Gentlemen:

Both my father, David Danis, and I enjoyed meeting with you last Sunday. We look forward to working with you in this matter and the other matters we discussed in the future.

We have preliminarily discussed your suggestion of consolidating our cases and pursuing the matter [in New Jersey]. Your suggestion has merit, and we are seriously entertaining the invitation . . . .

Please provide us with a general analysis of what you anticipate our role in the litigation would be if we consolidated our case, the Mississippi case and join the other plaintiffs we have lined up in other states to your suit. It is my suggestion that we negotiate some percentage of attorney fee allocation at the outset to protect both of our interests, and leave some flexibility for the remainder

---

18. The other three documents include: A January 9, 1996 letter by Mr. Deakle regarding fees; a July 1996 letter by David Danis regarding Chrysler fees; and a July 1996 letter by Mr. Phebus regarding Chrysler fees. Respondents claim that this correspondence would have been forwarded to David Danis per their instructions to their staff to not allow any Chrysler correspondence to reach them. The Grossman letter, however, was clearly known to them because it was authored by Joseph Danis.

so that it may be adjusted according to the amount of work and contribution provided by each party in the litigation....

This case has good merit and there will be plenty of money for all of the participants....

....

Very truly yours,
CAREY & DANIS, L.L.C.
/s/ Joseph P. Danis

Respondents maintain that, because they were not attorneys of record in the New Jersey ABS action and because there was never a contractual fee agreement reached, Request No. 25 was accurately answered. Respondents are incorrect. Judge Perry ordered production of "all documents which *refer or relate* to fee sharing or joint representation agreements with *any* attorneys or law firms concerning a client represented by Carey & Danis." (Emphasis added). In his letter, Danis discussed joining the *Beam* plaintiffs to Grossman's class action suit against Chrysler and was quite concerned about fee allocation. It is clear that the Grossman letter refers and relates to both a joint representation and a fee sharing agreement.

The Grossman letter is also clearly covered by Request No. 8. Judge Perry ordered the production of "all documents that *pertained or referred to actual or anticipated* litigation against Chrysler Corporation regarding *any* anti-lock brakes, heater cores or vehicle latches." (Emphasis added). Referring to the *Beam* class action and Grossman's class of ABS plaintiffs, Danis wrote, "We have ... discussed your suggestion of consolidating our cases ..." and asked Grossman to "provide us with a general analysis of what you anticipate our role ... would be." The Grossman letter unambiguously refers to both actual and anticipated anti-lock

brake cases against Chrysler—as do many of the forty-two documents Chrysler uncovered.

Both Carey and Danis admit in their respective briefs that there were no fewer than nine documents that were responsive to Chrysler's discovery requests but were not produced. When forced to confront the inaccuracies in the discovery responses, respondents defended themselves by placing blame on their attorneys and, when that failed, by saying "we didn't mean to do it." Respondents have refused to take responsibility for the misleading discovery responses to Chrysler and to the court. When asked about his responses to Chrysler's discovery, Danis replied, "the discovery requests were served upon my attorney," "my attorney received a request for production," and "Mr. Wuestling prepared a response." Both Carey and Danis contend that "any factual inaccuracy was [not] the result of conduct by" respondents, but was the fault of their attorneys. At the disciplinary hearing, when Chrysler could not produce a signed copy of Danis' interrogatory responses, Danis went so far as to deny ever having executing his interrogatory answers. He denied executing his responses even though he testified earlier, in his deposition, that "I actually recall this being sent for my execution" and that he reviewed the responses for their authenticity and genuineness.

Respondents are attorneys with a background in litigation. Each was responsible for vast amounts of contentious discovery while defending Chrysler in products liability class actions suits and later when representing plaintiffs. The federal court found, and the evidence supports, that by denying the existence of the documents and information requested in Interrogatory No. 2 and Requests for Production Nos. 8, 12, and 25, respondents purposefully withheld evidence from opposing counsel in violation of Rule 4–3.4(a) and Rule 4–

3.4(d), and made misstatements of material fact to the court in violation of Rule 4–3.3(a)(1), Rule 4–8.4(c) and Rule 4–8.4(d).

### III. Discipline

■■■ The purpose of discipline is not to punish the attorney, but to protect the public and maintain the integrity of the legal profession. Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction which serves to deter other members of the Bar from engaging in similar conduct. *In re Littleton,* 719 S.W.2d 772, 777 (Mo. banc 1986) (citations omitted). "[T]his Court is authorized to administer four types of discipline: reprimand; indefinite suspension; suspension for a fixed period; and disbarment." *In re Caranchini,* 956 S.W.2d 910, 919 (Mo. banc 1997). With respect to the form of discipline, we have said:

> In cases of false statements, fraud, or misrepresentation, this Court issues reprimands only if the lawyer is merely negligent in determining whether statements or documents are false, or fails to take remedial action when material information is withheld, thereby causing injury or potential injury to a party, or causing an adverse or potentially adverse effect on the legal proceeding.
>
> . . . .
>
> Suspension is appropriate when the lawyer knows that false statements are being submitted to the court, or that material information is improperly being withheld, and takes no remedial action, thus causing injury or potential injury to a party, or an adverse or potentially adverse effect on the legal proceeding.
>
> . . . .
>
> Disbarment is appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, thus causing serious or potentially serious injury to a party, or a significant or potentially significant adverse effect on the legal proceeding.

*In re Storment,* 873 S.W.2d 227, 231 (Mo. banc 1994). *See also Caranchini,* 956 S.W.2d at 919; *In re Oberhellmann,* 873 S.W.2d 851, 856 (Mo. banc 1994); ABA Standards Rule 6.11. "In determining the proper sanction, this Court must also consider aggravating and mitigating circumstances." *In re Cupples,* 979 S.W.2d 932, 938 (Mo. banc 1998).

■■■ Reprimand is appropriate only when the breach of discipline "does not involve dishonest, fraudulent, or deceitful conduct on the part of the attorney." *In re Littleton,* 719 S.W.2d 772, 777 (Mo. banc 1986). *See also In re Disney,* 922 S.W.2d 12, 16 (Mo. banc 1996); *In re Stricker,* 808 S.W.2d 356, 361 (Mo. banc 1991). Disbarment should be reserved for those cases in which it is clear that the attorney should not be at the Bar. *In re Littleton,* 719 S.W.2d at 777. *See also In re Caranchini,* 956 S.W.2d at 919; *In re Disney,* 922 S.W.2d at 15. This Court has "imposed the ultimate sanction of disbarment where a lawyer's conduct involved dishonesty and misrepresentation." *In re Cupples,* 979 S.W.2d at 936.

John Carey and Joseph Danis violated the trust of their former client when they prosecuted a Chrysler ABS class action lawsuit that was substantially related to their prior representation. In the subsequent action brought against them by Chrysler, respondents knowingly and intentionally withheld certain documents and information from discovery hoping to prevent any possible inference that they were involved in, and intended to share fees

from, Chrysler ABS class action lawsuits. A total of forty-two documents were uncovered, including the Grossman letter written by Joseph Danis and the Sheridan memo written by John Carey. Further, respondents failed to identify meetings with other lawyers in New York and St. Louis regarding *Beam* and other Chrysler class action lawsuits. "This misconduct is an affront to the fundamental and indispensable principle that a lawyer must proceed with absolute candor towards the tribunal. In the absence of that candor, the legal system cannot properly function." *In re Caranchini,* 956 S.W.2d at 919–20.

We must also consider any aggravating or mitigating factors. *In re Cupples,* 979 S.W.2d at 937. Several mitigating factors apply to respondents Carey and Danis. The Chief Disciplinary Counsel did not argue for disbarment. In his closing argument before the Disciplinary Hearing Panel, counsel for the Informant conceded that "there are way too many factors in mitigation of their conduct ... that mitigate the imposition [of] ... such a harsh sanction." The Informant also conceded that it is not "likely Joe [Danis] or John [Carey] is going to go out and do anything like they did here ever again. I don't think the public is going to be in a position to face this type of misconduct in the future."

Neither Carey nor Danis has been subject to disciplinary action or Bar complaints before or since the events that led them here. A number of attorneys, including attorneys from Thompson & Mitchell, testified to respondents' reputation for honesty and ethical conduct. Mr. Danis is actively engaged in two charities: Boys Hope and Kingdom House. Mr. Carey provides *pro bono* services to a number of programs, including Kingdom House and the National Association of Consumer Advocates. Finally, respondents have satisfied an $850,000 judgment

as the result of the default judgment resulting from their conduct in *Chrysler v. Carey & Danis.* While this is a private judgment and not part of the disciplinary process, it is of such a substantial amount to constitute a vivid reminder of the cost of inappropriate professional behavior.

Between disbarment and reprimand lies the sanction of suspension. Suspension is an appropriate intermediate sanction where reprimand is insufficient to protect the public and maintain the integrity of the profession, and where this Court does not believe that the acts of a respondent are such that he should not be at Bar. Suspension serves the dual purposes of discipline; it protects the public and maintains the integrity of the profession by deterring other members of the bar from engaging in similar conduct. Suspension also recognizes that while the focus of discipline is to achieve the purposes previously described, those purposes are inevitably achieved through punishment.

*In re Littleton,* 719 S.W.2d at 777–78 (citing *In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)).

Assessing discipline in cases such as this is always difficult. Here, two talented young lawyers, full of promise, lost their way among the economic temptations of modern practice and then again lost their way while struggling to defend themselves. In doing so, they violated two of the most fundamental principles of our profession, loyalty to the client and honesty to the bench. Significant discipline must follow to maintain the public's trust and confidence in our ability to police ourselves. A "slap on the wrist" will not suffice.

While disbarment would ordinarily be expected in a case such as this, the mitigating factors warrant some degree of leniency and offer hope that respondents can

return to the responsible practice of law having learned a very hard lesson.

John J. Carey and Joseph P. Danis are indefinitely suspended from the practice of law, with leave to apply for reinstatement not sooner than one year from the date of this opinion.

LIMBAUGH, C.J., WOLFF, BENTON and LAURA DENVIR STITH, JJ., and GARRETT, Sp.J., concur.

RICHARD B. TEITELMAN, J., dissents in separate opinion filed.

WHITE, J., not participating.

RICHARD B. TEITELMAN, Judge, dissenting.

I respectfully dissent from the majority's decision to suspend the respondents' licenses. Although the respondents' conduct fundamentally violated the rules of professional conduct, given the purposes of attorney discipline proceedings and the mitigating circumstances in this case, a public reprimand is the appropriate discipline.

Disciplinary actions are primarily remedial in nature. *In re Caranchini*, 956 S.W.2d 910, 914 (Mo. banc 1997). The overriding principle is to "protect society and maintain the integrity of the legal profession." *In re Frank*, 885 S.W.2d 328, 333 (Mo. banc 1994). An attorney who cannot or will not avoid violating the rules should be subject to suspension. See Conflicts of Interest in the Legal Profession, 94 Harv. L.Rev. 1244, 1500–1501 (1980–1981). Thus, discipline should be assessed according to the likelihood of preventing the attorney from again engaging in professional misconduct detrimental to the public or the integrity of the profession.

In this case, the record reflects that neither the public trust nor the profession's integrity is threatened by the respondents' continued, uninterrupted practice of law. First, neither respondent has had any other disciplinary action against their licenses. The Chief Disciplinary Counsel admits it is unlikely that either attorney will repeat their misconduct and that they do not pose a continuing threat to the public or the profession. Second, the respondents have already paid a heavy price for their misconduct. They have satisfied a substantial civil judgment and have been strongly rebuked by a federal court. Finally, both attorneys have volunteered their time and talent to community service projects. Mr. Carey provides *pro bono* legal work for several groups and Mr. Danis is actively involved in charitable activities. Suspending respondents' licenses years after they have put the conduct behind them and corrected their ways is unduly punitive and is not in accordance with the underlying purposes of attorney disciplinary proceedings. Under these circumstances, a public reprimand satisfies this Court's obligation to ensure that the public's trust and interest in the profession's integrity is upheld.